Donald **VAN DUSARTZ** and Audrey Van Dusartz, individually and on behalf of all others similarly situated, et al., Plaintiffs,

v.

Rolland F. **HATFIELD**, Auditor of the State of Minnesota, et al., Defendants.

No. 3–71 Civ. 243.

United States District Court,
D. Minnesota,
Third Division.

Oct. 12, 1971.

Roger S. Haydock, Delores C. Orey, Michael A. Wolff, John E. Brauch, Legal Assistance of Ramsey County, St. Paul, Minn., for plaintiffs. John E. Coons, Berkeley, Cal., of counsel.

John Mason, Sol. Gen., and Douglas Skor, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

This is one of three actions brought by various parties to challenge the constitutional validity of Minnesota's system of financing public elementary and secondary education. The companion cases are Minnesota Federation of Teachers, et al. vs. Hatfield, et al., 4–71 Civ. 458, and Minnesota Real Estate Taxpayers Association, et al. vs. State of Minnesota, et al., 3–71 Civ. 233.

Plaintiffs in the above-entitled action base their claims solely on the alleged denial of equal protection of the laws to a class of plaintiff school children they purport to represent. Jurisdiction of this court is invoked pursuant to 28 U. S.C. § 1343(3) and (4) because plaintiffs' cause of action arises under the Civil Rights Act, 42 U.S.C. § 1983.

Defendants have moved to dismiss in all three cases on the grounds that the complaints fail to state a claim upon which relief can be granted and that the cases are moot.

Since the above-entitled case appears to be on solid jurisdictional grounds as to the plaintiff pupils and does not raise pendent claims under the laws or Constitution of Minnesota, this Court chooses

to analyze the narrow claims presented here in light of the recent California Supreme Court decision in Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971). Although separate orders will be entered denying defendants' motions to dismiss in the other two cases, the Court chooses to postpone any ruling on the other complex issues presented by those complaints.

The primary purpose here is to test the plaintiff children's cause of action, and to examine the substantive issues raised by their complaint. With proper deference to the Legislature, it is appropriate to consider the correctness of the Serrano rule and to examine the applicability of the equal protection clause to the instant case.

■ The issue posed by the children, here as in Serrano, is whether pupils in publicly financed elementary and secondary schools enjoy a right under the equal protection guarantee of the 14th Amendment to have the level of spending for their education unaffected by variations in the taxable wealth of their school district or their parents. This Court concludes that such a right indeed exists and that the principle announced in Serrano v. Priest is correct. Plainly put, the rule is that the level of spending for a child's education may not be a function of wealth other than the wealth of the state as a whole. For convenience we shall refer to this as the principle of "fiscal neutrality", a reference previously adopted in Serrano.[1]

This Court will treat defendants' motion to dismiss as a motion for summary judgment in which, for the purposes here, plaintiffs' allegations of fact must be taken as true. These allegations will be supplemented by judicial notice of facts appearing in official public records and reports which have been stipulated to by the parties herein. The State has argued that the expiration of M.S.A. § 124.211 has rendered the complaint moot. If in fact the existing vacuum in "equalizing" state aids were to continue, the influence of district wealth variations would be even more extensive and invidious than what we are about to describe. In fact, the opposite is true; it has seriously aggravated the injury. In fairness to the State it shall be assumed —contrary to fact—that there presently continues in existence a system of subventions similar to the recently expired system.

■ The recently expired Minnesota system appears structurally indistinguishable in its basic parts from the California system described in the Serrano opinion, supra at 591–595, 96 Cal. Rptr. 601, 487 P.2d 1241. The Minnesota pupils—like those in Serrano—allege that the number of dollars per pupil spent in their school districts is a function of the amount of taxable wealth per pupil located within the boundaries of those districts and thus subject to the local educational levy. See M.S.A. Chapter 124. School districts in Minnesota differ in taxable wealth per pupil. Indeed, some districts have almost no taxable wealth while others range up to and even above 30,000 dollars per pupil. The plaintiff children reside in relatively poor districts.[2]

The State has assisted the poorer districts with "equalizing" aid but in a manner which offsets only a portion of the influence of district wealth varia-

---

1. The analysis here generally parallels that appearing in J. Coons, W. Clune, and S. Sugarman, Private Wealth and Public Education (Cambridge, Harvard University Press, 1970), hereinafter cited as Private Wealth and Public Education.

2. The rule adopted here and in Serrano does not depend upon the personal wealth of the pupils or their parents. It is sufficient that the plaintiffs be members of the larger class of pupils injured which class is defined as the pupil population of relatively poor school districts. Serrano v. Priest, 5 Cal.3d at 601, 96 Cal.Rptr. 601, 487 P.2d 1241. Whether "relative" poverty includes every district poorer than that one district richest in assessed valuation per pupil need not now be determined, nor would this appear to have great practical significance in the application of the general principle.

tions.[3] To be specific, in 1970–71 if a school district's tax rate were at least 20 mills, it was guaranteed a total of $404 spendable dollars by the State. Thus, if the local levy of 20 mills raised only $200 (in a district with $10,000 assessed valuation per pupil) the State supplemented this with a subvention of $204 per pupil. If the district was sufficiently wealthy that a 20-mill levy raised more than the $404 guarantee, it retained the excess collection and now has it available for expenditure. There appear to be a number of districts in this enviable position.

In addition the State has guaranteed to *every* district a minimum state subvention of $141 per pupil. Thus a rich district which raised $450 at the 20-mill rate may spend $591 per pupil. What is important about this flat grant is that it is useful only to the richer districts. Even if it were abolished, those districts poor in taxable wealth would receive no less than they now do, because the $141 is counted as part of the equalizing aid. As in our previous example, a poor district raising only $200 with the 20-mill local rate would receive its $204 from the state in "equalizing" money even if the $141 guaranteed minimum did not exist. Thus this latter guarantee acts in effect as a unique bonus solely for the benefit of rich districts.

Finally, insofar as districts exceed the 20-mill local tax rate (apparently all poor districts do) they are essentially on their own. For every additional mill on its local property a district with $20,000 valuation per pupil adds another $20 per child in spending; a district with $5,000 valuation per pupil adds only $5 in spending. Put another way, above 20 mills there is a high correlation per pupil wealth and the amount available to spend for education for the same mill rate.

To sum up the basic structure, the rich districts may and do enjoy both lower tax rates and higher spending. A district with $20,000 assessed valuation per pupil and a 40 mill tax rate on local property would be able to spend $941 per pupil; to match that level of spending the district with $5,000 taxable wealth per pupil would have to tax itself at more than three times that rate, or 127.4 mills.

There are apparently many minor refinements and subventions, none of which alter this essential pattern.[4] The overall conclusion is inescapable. The level of spending for publicly financed education in Minnesota is profoundly affected by the wealth of each school district. Children living in districts poorer than the richest are proportionately disadvantaged. It is this class which pupil plaintiffs claim to represent.

It may be true, of course, that not every difference in spending level is traceable into a difference in effectiveness of education. We must recognize that there has been disagreement among scholars over the degree to which money counts.[5] For present purposes, however, it is sufficient that the relation between cost and quality of education has been alleged. In any event, the Legislature would seem to have foreclosed this issue to the State by establishing a system encouraging variation in spending; it would be high irony for the State to

---

3. The examples that follow in the text are all hypothetical applications of M.S.A. § 124.211.

4. Defendants' contention that other categories of state aids substantially increase the revenue of many schools may raise a question of fact, i. e. whether dependence on local school district wealth is overcome by these other aids. However, for purpose of this motion, we must accept as true plaintiffs' allegation of wealth dependence.

5. The competing views are summed up in Serrano v. Priest, 5 Cal.3d at 601, 96 Cal. Rptr. at 613, 487 P.2d at 1253 (f. n. 16). It is noteworthy that, while Prof. James Coleman's earlier work is sometimes interpreted to question the cost-quality relation, his *foreword* to Private Wealth and Public Education suggests that spending differences are a significant factor in education.

argue that large portions of the educational budget authorized by law in effect are thrown away. The courts that have considered the issue are in agreement.[6]

Furthermore, this Court notes the affidavit of Van D. Mueller, attached to plaintiffs' brief in that it gives an indication of the correlation between spending per pupil and the quality of education. The statements made in the affidavit must, under the law, be taken as true for the purpose of determining whether plaintiffs have spelled out a cause of action. Mueller flatly states:

> The districts having the lowest perpupil expenditure, which are generally the poorest districts in terms of assessed valuation per-pupil unit, offer an education that is inferior to the districts having the highest per-pupil expenditures.

While the correlation between expenditure per pupil and the quality of education may be open to argument, the Court must assume here that it is high. To do otherwise would be to hold that in those wealthy districts where the per pupil expenditure is higher than some real or imaginary norm, the school boards are merely wasting the taxpayers' money. The Court is not willing to so hold, absent some strong evidence. Even those who staunchly advocate that the disparities here complained of are the result of local control and that such control and taxation with the resulting inequality should be maintained would not be willing to concede that such local autonomy results in waste or inefficiency.

The disparities demonstrated by the California court in *Serrano* stood out in bold relief, while the figures supplied by the Minnesota Department of Education tend to show a lack of such great disparities. Nevertheless, this Court must accept at face value the affidavit of Mueller which states that if the statistics for Minnesota are arranged in the same manner as in California, that is, dividing elementary and secondary school figures, the disparities are "very comparable". Thus, there is little or no difference between the factual allegations in this case and those in *Serrano*.

## II

The United States Supreme Court has employed two distinct approaches to claims asserted under the equal protection clause of the 14th Amendment. See, e. g. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). These approaches involve substantially different degrees of deference for state legislation depending upon its subject matter and character. Most regulation by the states of most kinds of interests is judged merely by the rationality of the relation between the state's objective and the means of regulation (the statutory or administrative classification) chosen. The Court does not ordinarily undertake to evaluate purposes and effects as such. This test of the relation of means to ends might plausibly be applied to the Minnesota system here attached. If the State's objective is a "general and uniform system" of education, as Article VIII, Sections 1 and 2 of the Minnesota Constitution declare, it might be wondered whether the means chosen are rationally adapted to that goal.

However, this issue is not reached because, in the present case, the stricter test of equal protection is clearly more appropriate. This approach requiring close scrutiny of the state law by the Court is triggered whenever either a "fundamental interest" is at stake or the state has employed a "suspect classification". Here both such factors are involved and mutually reinforce the pupil plaintiffs' attack upon the system.

First, as to the specially protected interest: Where the onus of a legislative classification falls upon an interest which is classified as "fundamen-

---

6. The cases are collected in the Serrano opinion at f.n. 16, 5 Cal.3d at 601, 96 Cal.Rptr. at 613, 487 P.2d at 1253.

tal", the State bears the burden of demonstrating a compelling interest of its own which is served by the challenged legislation and which cannot be satisfied by any other convenient legal structure.[7] That approach fits this case because the interest at stake is education. The Serrano opinion, *supra*, 5 Cal.3d at 604–610, 96 Cal.Rptr. 601, 487 P.2d 1241, has correctly inferred from relevant expressions of the United States Supreme Court and from the nature of education itself that this interest is truly fundamental in the constitutional sense.

It is unnecessary to repeat the persuasive analysis of the California court on this point, but it is worth observing that education in this respect is to be sharply distinguished from most other benefits and services provided by government.[8] It is not the "importance" of an asserted interest which alone renders it specially protected. One can concede the significance of welfare payments to an indigent and yet accept the result in Dan-

dridge v. Williams, where the Court did not face a suspect classification.[9] Education has a unique impact on the mind, personality, and future role of the individual child. It is basic to the functioning of a free society and thereby evokes special judicial solicitude.[10]

Now we consider the relevance of the legislative classification. As noted above, the pupils' objection to the financing system is augmented by the nature of the classifying fact—district wealth—by which the distribution of education is affected and, in significant degree, determined. In a number of decisions over the last fifteen years the United States Supreme Court has made it plain that classifications based upon wealth are suspect. These decisions, convincingly analyzed in Serrano,[11] are well known and need no comment here. What is important to note is that the objection to classification by wealth is in this case aggravated by the fact that the variations in wealth are State creat-

7. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). See also Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). The fundamental interest cases and the rationale of the correlative "compelling interest" test are considered at length in the Serrano opinion, 5 Cal.3d at 604–611, 96 Cal.Rptr. 601, 487 P.2d 1241.

8. And thus, incidentally, does not constitute an opening wedge for eventual fiscal neutrality in all government services through the medium of the 14th Amendment, Serrano v. Priest, 5 Cal.3d at 613–614, 96 Cal.Rptr. 601, 487 P.2d 1241; Coones, Clune, and Sugarman, Private Wealth and Public Education, 414–419 (1970).

9. 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). See also James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). (The interest in housing). In another respect Valtierra actually supports the "fundamentality" of the interest in education. The Court there empha-

sized the special importance of the democratic process exemplified in local plebiscites. That perspective here assists pupil plaintiffs who ask no more than equal capacity for local voters to raise school money in tax referenda, thus making the democratic process all the more effective.

10. Even the majority opinion in *Dandridge* seems to intimate this by its citation of the decision in Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) as the exemplar of the Court's commitment to a special view of equal protection in those areas where "freedoms guaranteed by the Bill of Rights" may be affected. 397 U.S. at 484, 90 S.Ct. at 1161. In *Shelton*, Mr. Justice Stewart for the majority had declared that "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools", 364 U.S. at 487, 81 S.Ct. at 251.

11. 5 Cal.3d at 597–604, 96 Cal.Rptr. 601, 487 P.2d 1241. Elaborate analyses of these cases appear in Note, "Developments in the Law—Equal Protection", 82 Harv. L.Rev. 1065 (1969); Michelman, "On Protecting the Poor Through the Fourteenth Amendment", 83 Harv.L.Rev. 7 (1969); Private Wealth and Public Education, 359–387.

ed. This is not the simple instance in which a poor man is injured by his lack of funds. Here the poverty is that of a governmental unit that the State itself has defined and commissioned. The heaviest burdens of this system surely fall *de facto* upon those poor families residing in poor districts who cannot escape to private schools, but this effect only magnifies the odiousness of the explicit discrimination by the law itself against all children living in relatively poor districts.

This does not suggest that by itself discrimination by wealth is necessarily decisive. No court has so held. However, when the wealth classification affects the distribution of public education, the constitutional significance is cumulative.[12]

It cannot be argued that a quality education endows its recipient with a distinct economic advantage over his less educated brethren. By these standards the inexorable effect of educational financing system such as here maintained puts the state in the position of making the rich richer and the poor poorer. If added to this problem is the problem that the parents of children who live in poor districts have also a lower income than the parents in wealthier districts, then the disparity may be even more severe than that alleged by plaintiffs.

### III

A state, of course, could have a powerful and legitimate interest in maintaining the strength of local government by preserving local choice in school spending. If that interest were "compelling" —and sufficiently so—and if because of some extremely important state need, it were necessary that only wealthy children be given quality education and that poor children be denied such, then the present financing structure might be justified. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Whether this interest of the State is constitutionally compelling, however, need not be decided for two reasons. By its own acts, the State has indicated that it is not primarily interested in local choice in school matters. In fact, rather than reposing in each school district the economic power to fix its own level of per pupil expenditure, the State has so arranged the structure as to guarantee that some districts will spend low (with high taxes) while others will spend high (with low taxes). To promote such an erratic dispersal of privilege and burden on a theory of local control of spending would be quite impossible.[13]

The second reason for ignoring the question of whether the State's interest is compelling is that, under the constitutional standard here adopted, if the state chooses to emphasize local control, it remains free to do so to whatever degree it wishes. In fact, it is the singular virtue of the *Serrano* principle that the State remains free to pursue all imaginable interests except that of distributing education according to wealth. The State makes the argument that what plaintiffs seek here is uniformity of expenditure for each pupil in Minnesota. Neither this case nor *Serrano* requires absolute uniformity of school expenditures. On the contrary, the fiscal neutrality principle not only removes

12. As with the conjunction of poverty and the voting interest in Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), or poverty and the interest in access to appellate review as in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

13. The *Serrano* opinion states the idea: "We need not decide whether such decentralized financial decision-making is a compelling state interest, since under the present financing system, such fiscal freewill is a cruel illusion for the poor school districts. * * * Far from being necessary to promote local fiscal choice, the present financing system actually deprives the less wealthy districts of that option. * * *" 5 Cal. 3d at 611, 96 Cal.Rptr. at 620, 487 P.2d at 1260.

discrimination by wealth but also allows free play to local effort and choice and openly permits the State to adopt one of many optional school funding systems which do not violate the equal protection clause.[14]

## IV

The State argues that the issues here posed have been foreclosed by McInnis v. Shapiro, 293 F.Supp. 327 (N.D.Ill.1968), aff'd sub nom McInnis v. Oglivie, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969), and Burruss v. Wilkerson, 310 F.Supp. 572 (W.D.Va.1969) aff'd nom. 397 U.S. 44, 90 S.Ct. 812, 25 L.Ed.2d 37 (1970). It is true that the present complaint—like the two decisions noted—contained references to a duty of the State to respond to individual "needs" of pupils. It appears that plaintiffs herein have now abandoned this aspect of their claim. In any event such a claim is in fact foreclosed by *McInnis* and *Burruss*, *supra*. These two decisions, however, do not speak to the issue here considered—whether there is a right to mere fiscal neutrality. As the *Serrano* decision makes clear, the Supreme Court left that issue open. See Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). The reasoning of the California court on this point is completely persuasive and this Court adopts it as its own. Serrano v. Priest, *supra*, 5 Cal.3d at 615–618, 96 Cal.Rptr. 601, 487 P.2d 1241.

## V

■ Therefore, this Court concludes that the allegations of the plaintiff children's complaint state a cause of action and that a system of public school financing which makes spending per pupil

a function of the school district's wealth violates the equal protection guarantee of the 14th Amendment to the Constitution of the United States. In accordance with the foregoing memorandum,

It is ordered that the motions of defendants to dismiss the action are denied.

The Court will retain jurisdiction of the case but will defer further action until after the current Minnesota Legislative session.

14. This Court in no way suggests to the Minnesota Legislature that it adopt any one particular financing system. Rather, this memorandum only recognizes a constitutional standard through which the Legislature may direct and measure its efforts. For an explication of some of the numerous school financing systems available which meet the equal protection

standard, see Guthrie, Kleindorfer, Levin and Stout, Schools and Inequality (1971) ; Coons, Clune, and Sugarman, Private Wealth and Public Education (1970), and "Educational Opportunity: A Workable Constitutional Test for State Financial Structures," 57 Cal.L.Rev. 305 (1969).