Demetrio P. **RODRIGUEZ** et al.

v.

**SAN ANTONIO INDEPENDENT
SCHOOL DISTRICT** et al.

Civ. A. No. 68–175–SA.

United States District Court,
W. D. Texas,
San Antonio Division.

Dec. 23, 1971.

As Clarified Jan. 26, 1972.

See also, D. C., 299 F.Supp. 476.

Arthur M. Gochman, San Antonio, Tex., for plaintiffs.

Crawford Martin, Atty. Gen., State of Texas, Pat Bailey, Asst. Atty. Gen., State of Texas, Austin, Tex., Raul Rivera, San Antonio, Tex., for defendant, Edgewood Independent School Dist.

Before GOLDBERG, Circuit Judge, SPEARS, Chief District Judge, and ROBERTS, District Judge.

PER CURIAM:

Pursuant to Rule 23, Federal Rules of Civil Procedure, plaintiffs bring this action on behalf of Mexican American school children and their parents who live in the Edgewood Independent School District, and on behalf of all other children throughout Texas who live in school districts with low property valuations. Jurisdiction of this matter is proper under 28 U.S.C. §§ 1331, 1343. This Court finds merit in plaintiffs' claim that the current method of state financing for public elementary and secondary education deprives their class of equal protection of the laws under the Fourteenth Amendment to the United States Constitution.[1]

Edgewood and six other school districts lie wholly or partly within the city of San Antonio, Texas. Five additional districts are located within rural Bexar County. All of these districts and their counterparts throughout the State are dependent upon federal, state, and local sources of financing. Since the federal government contributes only about ten percent of the overall public school expenditures, most revenue is derived from local sources and from two state programs—the Available School Fund and the Minimum Foundation Program. In accordance with the Texas Constitution, the $296 million in the Available School Fund for the 1970–1971 school year was allocated on a per capita basis determined by the average daily attendance within a district for the prior school year.

Costing in excess of one billion dollars for the 1970–1971 school year, the Minimum Foundation Program provides grants for the costs of salaries, school maintenance and transportation. Eighty percent of the cost of this program is financed from general State revenue with the remainder apportioned to the school districts in "the Local Fund Assignment." Tex.Educ.Code Ann. arts. 16.71–16.73 (1969), V.T.C.A. Although generally measuring the variations in taxpaying ability, the Economic Index employed by the State to determine each district's share of "the Local Fund Assignment" (Tex.Educ.Code Ann. arts. 16.74–16.78) has come under increasing criticism.[2]

To provide their share of the Minimum Foundation Program, to satisfy bonded indebtedness for capital expenditures, and to finance all expenditures above the state minimum, local school districts are empowered within statutory or constitutional limits to levy and collect ad valorem property taxes. Tex. Const. art. 7, §§ 3, 3a, Vernon's Ann.St.; Tex.Educ.Code Ann. art. 20.01 et seq. Since additional tax levies must be approved by a majority of the property-taxpaying voters within the individual district, these statutory and constitutional provisions require as a practical matter that all tax revenues be expended solely within the district in which they are collected.

Within this ad valorem taxation system lies the defect which plaintiffs challenge. This system assumes that the value of property within the various districts will be sufficiently equal to sustain comparable expenditures from one district to another.

---

1. See Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971); and Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.Minn.1971). Serrano convincingly analyzes discussions regarding the suspect nature of classifications based on wealth, and Van Dusartz points out that in this type case "the variations in wealth are State created. This is not the simple instance in which a poor man is injured by his lack of funds. Here the poverty is that of a governmental unit that the State itself has defined and commissioned."

2. See The Challenge and the Chance, RPT. of the Governor's Comm. on Public School Educ. 58–68 (1968). The accuracy of the Economic Index is the subject of separate litigation in Fort Worth Ind. School Dist. v. J. W. Edgar (N.D.Tex., Fort Worth Div.).

It makes education a function of the local property tax base. The adverse effects of this erroneous assumption have been vividly demonstrated at trial through the testimony and exhibits adduced by plaintiffs. In this connection, a survey of 110 school districts[2a] throughout Texas demonstrated that while the ten districts with a market value of taxable property per pupil above $100,000 enjoyed an equalized tax rate per $100 of only thirty-one cents, the poorest four districts, with less than $10,000 in property per pupil, were burdened with a rate of seventy cents. Nevertheless, the low rate of the rich districts yielded $585 per pupil, while the high rate of the poor districts yielded only $60 per pupil. As might be expected, those districts most rich in property also have the highest median family income and the lowest percentage of minority pupils, while the poor property districts are poor in income and predominately minority in composition.[3]

Data for 1967–1968 show that the seven San Antonio school districts follow the statewide pattern. Market value of property per student varied from a low of $5,429 in Edgewood, to a high of $45,095 in Alamo Heights. Accordingly, taxes as a percent of the property's market value were the highest in Edgewood and the lowest in Alamo Heights. Despite its high rate, Edgewood produced a meager twenty-one dollars per pupil from local ad valorem taxes, while the lower rate of Alamo Heights provided $307 per pupil.

Nor does State financial assistance serve to equalize these great disparities. Funds provided from the combined local-state system of financing in 1967–1968 ranged from $231 per pupil in Edgewood to $543 per pupil in Alamo Heights. There was expert testimony to the effect that the current system tends to subsidize the rich at the expense of the poor, rather than the other way around. Any mild equalizing effects that state aid may have do not benefit the poorest districts.

■ For poor school districts educational financing in Texas is, thus, a tax more spend less system. The constitutional and statutory framework employed by the State in providing education draws distinction between groups of citizens depending upon the wealth of the district in which they live. Defendants urge this Court to find that there is a reasonable or rational relationship between these distinctions or classifications and a legitimate state purpose. This rational basis test is normally applied by the courts in reviewing state commercial or economic regulation. *See, e. g.,* McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). More than mere rationality is required, however, to maintain a state classification which affects a "fundamental interest", or which is based upon wealth. Here both factors are involved.

These two characteristics of state classification, in the financing of public education, were recognized in Hargrave v. McKinney, 413 F.2d 320, 324 (5th Cir. 1969), on remand, Hargrave v. Kirk, 313 F.Supp. 944 (M.D.Fla.1970), vacated on other grounds sub nom., Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). Among the authorities relied upon to support the *Hargrave* conclusion "that lines drawn on wealth are suspect" is Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1965).[4] In striking down a poll tax

---

**2a.** The total number of districts in the state is approximately 1200.

**3.** Plaintiffs' Exhibit VIII shows 1960 median family income of $5,900 in the top ten districts and $3,325 in the bottom four. The rich districts had eight per cent minority pupils while the poor districts were seventy-nine percent minority.

**4.** In addition, the court relied upon Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585,

requirement because of the possible effect upon indigent voting, the Supreme Court concluded that "(1)ines drawn on the basis of wealth or property, like those of race . . . are traditionally disfavored . . .. To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." Likewise McDonald v. Bd. of Election Comm'rs of Chicago, 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969), noted that "a careful examination on our part is especially warranted where lines are drawn on the basis of wealth . . which would independently render a classification highly suspect and thereby demand a more exacting judicial scrutiny."

Further justification for the very demanding test which this Court applies to defendants' classification is the very great significance of education to the individual. The crucial nature of education for the citizenry lies at the heart of almost twenty years of school desegregation litigation. The oft repeated declaration of Brown v. Bd. of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), continues to ring true:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is de-

nied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

Because of the grave significance of education both to the individual and to our society, the defendants must demonstrate a compelling state interest that is promoted by the current classifications created under the financing scheme.

Defendants insist that the Court is bound by the opinions in McInnis v. Shapiro, 293 F.Supp. 327 (N.D.Ill.1968), aff'd mem. sub nom. McInnis v. Ogilvie, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969); and Burruss v. Wilkerson, 310 F.Supp. 572 (W.D.Va.1969), aff'd mem., 397 U.S. 44, 90 S.Ct. 812, 25 L.Ed.2d 37 (1970). However, we disagree.

The development of judicially manageable standards is imperative when reviewing the complexities of a state educational financing scheme. Plaintiffs in *McInnis* sought to require that educational expenditures in Illinois be made solely on the basis of the "pupils' educational needs." Defining and applying the nebulous concept "educational needs" would have involved the court in the type of endless research and evaluation for which the judiciary is ill-suited.[5] Accordingly, the court refused the claim that the equal protection clause of the Fourteenth Amendment demands such an unworkable standard. The subsequent affirmance, without opinion, by the Supreme Court would not, in our opinion, bar consideration of plaintiffs' claim that lines in Texas have been drawn on the basis of wealth. The same situation prevails with respect to *Burruss* where the Court, in referring to the "varying needs" of the students, found the circumstances "scarcely distinguishable" from *McInnis*.

In the instant case plaintiffs have not advocated that educational expenditures

---

100 L.Ed. 891 (1956), which are decisions invalidating state laws that discriminated against criminal defendants because of their poverty.

5. Difficulties in defining the term are discussed at note 4, 293 F.Supp. 329.

be equal for each child.[6] Rather, they have recommended the application of the principle of "fiscal neutrality." Briefly summarized, this standard requires that the quality of public education may not be a function of wealth, other than the wealth of the state as a whole. Unlike the measure offered in *McInnis*, this proposal does not involve the Court in the intricacies of affirmatively requiring that expenditures be made in a certain manner or amount. On the contrary, the state may adopt the financial scheme desired so long as the variations in wealth among the governmentally chosen units do not affect spending for the education of any child.

Considered against this principle of "fiscal neutrality", defendants' arguments for the present system are rendered insubstantial. Not only are defendants unable to demonstrate compelling state interests for their classifications based upon wealth, they fail even to establish a reasonable basis for these classifications. They urge the advantages of the present system in granting decisionmaking power to individual districts, and in permitting local parents to determine how much they desire to spend on their children's schooling. However, they lose sight of the fact that the state has, in truth and in fact, limited the choice of financing by guaranteeing that "some districts will spend low (with high taxes) while others will spend high

(with low taxes)." [7] Hence, the present system does not serve to promote one of the very interests which defendants assert.

■ Indicative of the character of defendants' other arguments is the statement that plaintiffs are calling for "socialized education". Education, like the postal service has been socialized, or publicly financed and operated almost from its origin. The *type* of socialized education, not the question of its existence, is the only matter currently in dispute. One final contention of the defendants however calls for further analysis. In essence, they argue that the state may discriminate as it desires so long as federal financing equalizes the differences. Initially, the Court notes that plaintiffs have successfully controverted the contention that federal funds do in fact compensate for state discrimination.[8] More importantly, defendants have not adequately explained why the acts of other governmental units should excuse them from the discriminatory consequences of state law. Hobson v. Hansen, 269 F.Supp. 401 at 496, countered defendants' view by finding that the federal aid to education statutes [9]

. . . are manifestly intended to provide extraordinary services at the slum schools, not merely to compensate for inequalities produced by local school boards in favor of their middle-income schools. Thus, they cannot be

6. Indeed, it is difficult to see how the defendants reach a contrary conclusion since even the McInnis plaintiffs did not request precisely equal expenditures per child.

7. As the Court said in Van Dusartz v. Hatfield, supra, note 1: "By its own acts, the State has indicated that it is not primarily interested in local choice in school matters. In fact, rather than reposing in each school district the economic power to fix its own level of per pupil expenditure, the State has so arranged the structure as to guarantee that some districts will spend low (with high taxes) while others will spend high (with low taxes). To promote such an erratic dispersal of privilege and burden

on a theory of local control of spending would be quite impossible."

8. Plaintiffs' Exhibit 8, Table X, indicates that while Edgewood receives the highest federal revenues per pupil of any district in San Antonio, $108, and Alamo Heights, the lowest, $36, the former still has the lowest combined local-state-federal revenues per pupil, $356, and the latter the highest, $594.

9. The statutes involved where the Economic Opportunity Act, 42 U.S.C. §§ 2781–2791 (1964); the Elementary and Secondary Education Act, 20 U.S.C. §§ 241a–241l (1970 Supp.), and federally impacted areas aid, 20 U.S.C. §§ 236–244 (1964), as amended, (1970 Supp.).

regarded as curing any inequalities for which the Board is otherwise responsible.

Since they were designed primarily to meet special needs in disadvantaged schools, these funds cannot be employed as a substitute for state aid without violating the Congressional will. Further support for this view is offered by a series of decisions prohibiting deductions from state aid for districts receiving "impacted areas" aid.[10] Performance of its constitutional obligations must be judged by the state's own behavior, not by the actions of the federal government.

■ While defendants are correct in their suggestion that this Court cannot act as a "super-legislature", the judiciary can always determine that an act of the legislature is violative of the Constitution. Having determined that the current system of financing public education in Texas discriminates on the basis of wealth by permitting citizens of affluent districts to provide a higher quality education for their children, while paying lower taxes, this Court concludes, as a matter of law, that the plaintiffs have been denied equal protection of the laws under the Fourteenth

Amendment to the United States Constitution by the operation of Article 7, § 3 of the Texas Constitution and the sections of the Education Code relating to the financing of education, including the Minimum Foundation Program.

Now it is incumbent upon the defendants and the Texas Legislature to determine what new form of financing should be utilized to support public education.[11] The selection may be made from a wide variety of financing plans so long as the program adopted does not make the quality of public education a function of wealth other than the wealth of the state as a whole.

■ Accordingly, it is ordered that:

(1) The defendants and each of them be preliminarily and permanently restrained and enjoined from giving any force and effect to the operation of said Article 7, § 3 of the Texas Constitution, and the sections of the Texas Education Code relating to the financing of education, including the Minimum Foundation School Program Act, insofar as they discriminate against plaintiffs and others on the basis of wealth other than the wealth of the State as a whole, and that defendants, the Commissioner of Education and the members of the State Board

10. These cases have held that the statute clearly provides that the aid is intended as special assistance to local educational agencies, and that to permit a reduction in state aid would violate the Congressional intent. Douglas Ind. School Dist. No. 3 v. Jorgenson, 293 F.Supp. 849 (D.S.D. 1968); Hergenreter v. Hayden, 295 F. Supp. 251 (D.Kan.1968); Shepheard v. Godwin, 280 F.Supp. 869 (E.D.Va.1968); Carlsbad Union School Dist. v. Rafferty, 300 F.Supp. 434 (S.D.Cal.1969), aff'd, 429 F.2d 337 (9th Cir. 1970), and Triplett v. Tiemann, 302 F.Supp. 1244 (D. Neb.1969). After these actions arose, the statute was amended to prohibit aid to schools in any state which has "taken into consideration payments under this sub-chapter in determining the eligibility of any local educational agency in that State for State aid . . . ." 20 U.S.C. §§ 240(d) (2) (1969).

11. On October 15, 1969 this Court indicated its awareness of the fact that the Legislature of Texas, on its own initiative, had authorized the appointment of a committee to study the public school system of Texas and to recommend "a specific formula or formulae to establish a fair and equitable basis for the division of the financial responsibility between the State and the various school districts of Texas". It was then felt that ample time remained for the committee to "explore all facets and all possibilities in relation to the problem area", in order for appropriate legislation to be enacted not later than the adjournment of the 62nd Legislature, and since the legislature appeared ready to grapple with the problems involved, the trial of this cause was held in abeyance pending further developments. Unfortunately, however, no action was taken during the 62nd Session which has adjourned. Hopefully, the Governor will see fit to submit this matter to one or more special sessions so that members of the legislature can give these complex and complicated problems their undivided attention.

of Education, and each of them, be ordered to reallocate the funds available for financial support of the school system, including, without limitation, funds derived from taxation of real property by school districts; and to otherwise restructure the financial system in such a manner as not to violate the equal protection provisions of both the United States and Texas Constitutions;

(2) The mandate in this cause shall be stayed for a period of two years in order to afford the defendants and the Legislature an opportunity to take all steps reasonably feasible to make the school system comply with the applicable law; and without limiting the generality of the foregoing, to reallocate the school funds, and to otherwise restructure the taxing and financing system so that the educational opportunities afforded the children attending Edgewood Independent School District, and the other children of the State of Texas, are not made a function of wealth other than the wealth of the State as a whole, as required by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

(3) Our holding that the plaintiffs have been denied equal protection of the laws under the Fourteenth Amendment to the United States Constitution by the operation of Article 7, § 3 of the Texas Constitution, and the sections of the Texas Education Code relating to the financing of education, including the Minimum Foundation Program, shall have prospective application only, and shall not become effective until after the expiration of two years from December 23, 1971. This order shall in no way affect the validity, incontestibility, obligation to pay, source of payment or enforceability of any presently outstanding bond, note or other security issued, or contractual obligation incurred by a school district in Texas for public school purposes, nor the validity or enforceability of any tax or other source of payment of any such bond, note, security or obligation; nor shall this judgment in any way affect the validity, incontestibility, obligation of payment, source of payment or enforceability of any bond, note or other security to be issued and delivered, or contractual obligation incurred by Texas school districts, for authorized purposes, during the period of two years from December 23, 1971, nor shall the validity or enforceability of any tax or other source of payment for any such bond, note or other security issued and delivered, or any contractual obligation incurred during such two year period be affected hereby; it being the intention of this Court that this judgment should be construed in such a way as to permit an orderly transition during said two year period from an unconstitutional to a constitutional system of school financing.

(4) The Court retains jurisdiction of this action to take such further steps as may be necessary to implement both the purpose and spirit of this order, in the event the Legislature fails to act within the time stated, but, as we understand the law, this constitutes no impediment with respect to the finality of this judgment for the purpose of appeal, and none is intended. See Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); 263 F.Supp. 225 (S.D.Fla. 1967); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Gunn v. University Committee to End War in Viet Nam, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970); and Klahr v. Goddard, 254 F.Supp. 997 (D.Ariz. 1966). Needless to say, we hope that no further action by this Court will be necessary.