Charles JELLIFFE, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

and

William P. JONES, on behalf of himself and all others similarly situated, Intervenor-Plaintiff,

v.

Robert I. BERDON, Treasurer of the State of Connecticut, et al., Defendants.

Civ. A. No. 14821.

United States District Court, D. Connecticut.

June 12, 1972.

———◆———

Robert J. Wise, Simsbury, Conn., for plaintiffs.

William P. Jones, Darien, Conn., for intervenor-plaintiff.

F. Michael Ahern, Asst. Atty. Gen., State of Connecticut, Hartford, Conn. (Robert K. Killian, Atty. Gen., State of Connecticut, Hartford, Conn., on the brief), for defendant State officials.

Stephen Pierson, Town Counsel, Darien, Conn. (Pierson, Duel & Holland, Darien, Conn., on the brief), for defendant Town of Darien officials.

Edwin Gordon Hebb, Jr., Corporation Counsel, and Fannie Himmelstein, Asst. Corp. Counsel, West Hartford, Conn., for defendant Town of West Hartford officials.

Before TIMBERS, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

TIMBERS, Circuit Judge:

In this action challenging the constitutionality of the provisions of the Connecticut statutes, Conn.Gen.Stat. §§ 10–56, 60, 222, 241, 248, 262 and 263 (1958), as amended, which provide an educational financing system for elementary and secondary schools in the State of Connecticut, a motion for a preliminary injunction has been made by the intervenor-plaintiff, William P. Jones, Esq. (hereinafter, "intervenor"), seeking to enjoin the defendant State officials and the defendant Town of Darien officials "from any act, from disbursing any funds and from issuing or guaranteeing any bonds to implement or further" the construction of a public high

school building in the Town of Darien "under the prevailing public school financing system."

After a hearing, we entered an order from the bench on May 15, 1972 denying in all respects the motion for a preliminary injunction. Having invited counsel for the respective parties to submit proposed findings of fact and conclusions of law, we now file this opinion setting forth the reasons for our denial of the preliminary injunction, including our findings and conclusions in compliance with Fed.R.Civ.P. 52(a).

## PARTIES TO THE ACTION

Plaintiffs are three minor school children and their four parents. The children attend public schools in the Towns of Bridgeport and Enfield. The children and parents are citizens of Connecticut and residents of the respective Towns. They sue on behalf of themselves and others similarly situated.

Defendant State officials are the Treasurer, the Attorney General and the Commissioner of Education of the State of Connecticut, together with the members of the State Board of Education of the State of Connecticut.

Defendant Town of Darien officials are the Treasurer, the Tax Collector and the Superintendent of Schools of the Town of Darien.

Defendant Town of West Hartford officials are the Treasurer, the Tax Collector and the Superintendent of Schools of the Town of West Hartford.

Defendant State officials are sued in their official capacities. Defendant Town officials are sued in their official capacities and as representatives of a purported class of all similar town officials of all towns in Connecticut.

Intervenor sues on his own behalf and on behalf of others similarly situated.

He purports to represent a class consisting of "those who are citizens, residents, electors and taxpayers of and in the Town of Darien." [1]

## JURISDICTION

Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983 (1970) and 28 U.S.C. §§ 1331, 1343(3) and (4) (1970).

Since the action seeks injunctive relief with respect to provisions of the statutes of the State of Connecticut, a special statutory district court of three judges has been convened to hear and determine the action pursuant to 28 U.S.C. §§ 2281 and 2284 (1970).

## PRIOR PROCEEDINGS

This action seeking declaratory and injunctive relief was commenced by the filing of the original complaint on December 30, 1971. Amended complaints were filed on January 10, 1972 and March 21, 1972. Answers to the second amended complaint have been filed by defendants.

The motion by William P. Jones, Esq. to intervene as a party plaintiff was granted on April 10, 1972.

An order designating three judges to hear and determine the action was entered on April 19, 1972 by Chief Judge Friendly of the United States Court of Appeals for the Second Circuit.

On May 15, 1972, the three judge Court held a hearing at Hartford on the intervenor's motion for a preliminary injunction. The record before the Court consists of the pleadings; facts established by stipulation; exhibits attached to the pleadings; affidavits; and the transcript of the oral arguments of counsel for the respective parties. No oral evidence was received.[2] The Court

---

1. No class action determination with respect to any of the above purported classes has been requested of, or made by, the Court pursuant to Fed.R.Civ.P. 23(c).

2. At the outset of this hearing, the Court suggested, in the interest of expediting proceedings, that the trial of the action on the merits be consolidated with the hearing on the motion for a preliminary

has found helpful such briefs, proposed findings of fact and conclusions of law as have been submitted.

As indicated above, the motion for a preliminary injunction was denied by an order entered from the bench at the conclusion of the hearing on May 15, 1972.

### THEORY OF MAIN ACTION

The intervenor's motion for a preliminary injunction to enjoin construction of a public high school building in Darien invokes familiar principles of equity which require us to decide two essential questions: (1) whether it is reasonably probable that plaintiffs will prevail at the trial of the main action; and (2) whether denial of a preliminary injunction will cause irreparable injury to the party seeking it. Omega Importing Corporation v. Petri-Kine Camera Co., 451 F.2d 1190, 1193–94 (2 Cir. 1971); Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319, 323 (2 Cir.), cert. denied, 394 U.S. 999 (1969); 7 Moore's Federal Practice ¶ 65.04[1] (1971).

We believe that a brief analysis of the theory of the main action is necessary to an understanding of our suggestion to counsel at the outset of the preliminary injunction hearing, first, that the Court would assume arguendo, solely for the purpose of the instant motion, the likelihood of plaintiffs' success on the merits at the trial of the main action; and, second, that the narrow remaining issue for determination would be whether the intervenor could show irreparable injury if the preliminary injunction were denied. Counsel for all parties accepted the Court's suggestion and the hearing proceeded accordingly. We therefore turn directly to an analysis of the theory of the main action.

Connecticut, like almost all other states, supports its public school system largely through local property taxation. This method of financing produces substantial disparities among school districts in the revenue available per pupil.

Plaintiff school children and their parents reside in several school districts with relatively low per pupil expenditures. They have brought this class action alleging that Connecticut's system of financing public schools violates the equal protection clause of the Fourteenth Amendment. They also argue that parents in poorer school districts are the victims of unconstitutional discrimination because they have to be taxed at a higher rate than parents in richer districts in order to obtain for their children equal or even inferior educational opportunities. Plaintiffs therefore seek declaratory relief and a permanent injunction barring the operation of the present financing system and any system which is based on the wealth of individual school districts.

We assume for purposes of the instant motion—but most emphatically without deciding—that the allegations of the complaint, if proven, would establish that the school financing system invidiously discriminates on the basis of wealth in violation of the equal protection clause. Five recent decisions have held that systems quite similar to Connecticut's do violate the equal protection clause. Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D.Tex.1972) (three judge court), prob. juris. noted, 40 U.S.L.W. 3576 (U.S. June 7, 1972); Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.Minn. 1971); Robinson v. Cahill, 118 N.J. Super. 223, 287 A.2d 187 (1972) (New Jersey Supreme Court); Sweetwater County Planning Committee v. Hinkle, 491 P.2d 1234 (1971) (Wyoming Supreme Court); Serrano v. Priest, 5 Cal. 3d 584, 487 P.2d 1241, 96 Cal.Rptr. 601 (1971) (California Supreme Court).

injunction. Fed.R.Civ.P. 65(a) (2). Upon being informed by counsel for plaintiffs, however, that plaintiffs would require another 60 days to prepare for trial, the Court's suggestion was withdrawn. The Court did permit counsel who requested permission to do so to make certain offers of proof, as reflected by the transcript.

As these decisions have recognized, the Supreme Court has employed two distinct approaches to claims asserted under the equal protection clause. Most state regulations and statutes are judged merely by the rationality of the relation between the state's objective and the statutory or administrative classification chosen. This rational basis test normally is applied by the courts in reviewing state commercial or economic regulation. See McGowan v. Maryland, 366 U.S. 420 (1961). The rational basis test accords a great deal of deference to state legislation.

A stricter test of equal protection, however, is applied in certain situations. The approach requiring close scrutiny of state laws by courts is triggered whenever either a "fundamental interest" is at stake or the state has employed a "suspect classification". In the school financing cases cited above, all of the courts have applied this more stringent standard of judicial review. Under this standard, the state bears the burden of establishing, not only that it has a compelling interest which justifies the law, but also that the distinctions drawn by the law are necessary to further its purpose. Needless to say, the state's burden under this test is more difficult to sustain than under the rational basis test. Once a court subjects a state statute or regulation to the close scrutiny required by the strict test, the statute is almost invariably stricken down as unconstitutional.

The school financing cases have held that a system based largely on local property taxation triggers close judicial scrutiny, because such a system touches upon a fundamental interest and involves a suspect classification.

The fundamental interest at stake in school financing systems is education. While the Supreme Court has never specifically recognized education as a fundamental interest, "[t]he crucial nature of education for the citizenry lies at the heart of almost twenty years of school desegregation litigation." Rodriguez v. San Antonio Independent School District, supra, 337 F.Supp. at 283. The school financing cases have inferred from relevant expressions of the Supreme Court and from the nature of education itself that this interest is truly fundamental in the constitutional sense.

In addition to holding that education is a fundamental interest, the cases cited above have found that financing systems based on local property taxation involve a suspect classification—wealth. As the Supreme Court noted in Harper v. Virginia State Board of Elections, 383 U.S. 663, 668 (1966), "[l]ines drawn on the basis of wealth or property, like those of race, are traditionally disfavored." Moreover, in McDonald v. Board of Election, 394 U.S. 802, 807 (1969), the Supreme Court said that "a careful examination on our part is especially warranted where lines are drawn on the basis of wealth . . . which would independently render a classification highly suspect and thereby demand a more exacting judicial scrutiny." True, the Supreme Court has never held that discrimination on the basis of wealth is sufficient by itself to trigger strict judicial review. Nevertheless, as the court stated in Van Dusartz v. Hatfield, supra, 334 F.Supp. at 876, "when the wealth classification affects the distribution of public education, the constitutional significance is cumulative."

If this Court were to determine that the statute is subject to strict scrutiny, it then would have to decide whether the state has a compelling interest which justifies the financing system and whether the distinctions drawn by that system are necessary to further its purposes.

The financing cases cited above indicate the arguments advanced to support the type of financing system here involved. First, states tend to argue that they have an interest in delegating responsibility for schools to local units. It has been held, however, that this interest may be satisfied as well under alternative financing arrangements. See Serrano v. Priest, supra, 487 P.2d at 1260, 5 Cal.3d at 610. Second, states as-

sert that local units should be permitted to set their budgets to reflect their own sense of educational priorities. Here again, courts have indicated that it is questionable whether the type of financing system here involved does in fact further that interest. Poor districts have no option but to tax as highly as possible to support even a minimum educational effort. And it is at least arguable that local financial discretion exists in reality only for the rich districts.

In striking down financing systems based on local property taxation, however, courts have not required that future educational expenditures be equal for each child. Rather, they have recommended the application of the principle of "fiscal neutrality". Briefly stated, this principle requires that the quality of public education may not be a function of wealth, other than the wealth of the state as a whole. A state could adopt one of a variety of different financing systems, as long as expenditure per pupil is not a direct function of the wealth of the individual school district in which he resides.

Moreover, the decisions which have held that financing systems based on local property taxation are unconstitutional have given state legislatures two or three years to establish a constitutional scheme. To date, in only two cases have judgments actually been entered against the states. In the *Serrano, Van Dusartz* and *Sweetwater County Planning Committee* cases, *supra*, the courts indicated that financing systems based on local property taxation violate the equal protection clause, but no final judgments were entered since the courts in those cases were ruling on motions to dismiss for failure to state a cause of action. In the two cases in which final judgments have been entered, however, the courts have made it clear that their rulings are prospective and dates for compliance have been fixed two or three years. from the dates the judgments were filed. Thus, in Rodriguez v. San Antonio Independent School District, *supra*, the three judge court said:

"This order shall in no way affect the validity, incontestibility, obligation to pay, source of payment or enforceability of any presently outstanding bond, note or other security issued, or contractual obligation incurred by a school district in Texas for public school purposes, nor the validity or enforceability of any tax or other source of payment of any such bond, note, security or obligation; nor shall this judgment in any way affect the validity, incontestibility, obligation of payment, source of payment or enforceability of any bond, note or other security to be issued and delivered, or contractual obligation incurred by Texas school districts, for authorized purposes, during the period of two years from December 23, 1971 . . . ." 337 F.Supp. at 286.

In Robinson v. Cahill, *supra,* the New Jersey Supreme Court entered a similar order:

"This declaration shall not invalidate past or future obligations (such as school bonds, anticipation notes, etc.) incurred under the provisions of existing school laws and tax laws." 287 A.2d at 217.

The courts in *Rodriguez* and *Robinson* wisely made their decisions prospective and made their judgments effective two or three years from the dates of entry. Otherwise, a court would continually be involved in passing on the appropriateness of various school building projects while the state legislatures were considering what financing system to adopt. Moreover, it would be unfair to deprive pupils of badly needed school buildings during that two to three year period. In any event, until a state legislature decides what type of system it is going to adopt, there is no way for a court to know whether a particular project will perpetuate existing inequities.

## PRELIMINARY INJUNCTION RELIEF SOUGHT AND DENIED

With this analysis of the main action and the school financing cases after which it is patterned in mind, we turn

directly to the preliminary injunction relief sought by intervenor and our reasons for denying the injunction.

At the outset, the relationship of this intervenor to the overall action should be borne in mind. Three of the named defendants are officials of the Town of Darien. They have been cited as defendants because during the 1970–1971 school year Darien expended $1,468.60 per pupil for the operation of its public school system—the highest of any town in the state (Exhibit A attached to the second amended complaint).

Intervenor is a resident and taxpayer of the Town of Darien. While he purports to represent as a class all citizens, residents, electors and taxpayers of Darien, no class action determination has been requested or made. He seeks, by way of preliminary injunction, to enjoin the defendant Town of Darien officials and the defendant State officials from taking any action to finance the construction of a public high school in Darien under the prevailing public school financing system. The planning for this high school has been under way for about six years. It is estimated that it will cost approximately $4,000,000.

While intervenor's net is cast so broadly on the instant preliminary injunction motion as purportedly to encompass the entire high school project, actually the only expenditure presently authorized by the Board of Education, the Board of Finance and the Representative Town Meeting in Darien is the sum of $32,000 for plans, specifications and recommendations of architects. The last step in the authorization procedure for the $32,000 was its approval by the RTM on January 24, 1972. Such approval of that sum does not commit the Town to any further action.

As indicated above, solely for the purpose of the instant preliminary injunction motion, we assume without deciding that it is reasonably probable that plaintiffs (with whom intervenor identifies himself) will prevail at the trial of the main action. We hold, however, that intervenor has not sustained his burden of establishing that he will suffer irreparable injury by the denial of the preliminary injunction. Our reasons for so holding may be briefly summarized as follows:

(1) Stated in the light most favorable to intervenor, his essential claim is that the expenditure of any sum for construction of a new public high school in Darien, including specifically the presently authorized sum of $32,000 for plans, specifications and recommendations, will "increase and entrench the existing· disparities and inequities" between Darien's highest per pupil expenditure of $1,468.60 and the lower per pupil expenditures of other public school systems throughout the State (e. g. that of the Town of Griswold in amount of $532.02, the lowest in the State)—all as reflected in Exhibit A attached to the second amended complaint. Intervenor's claim in this respect, however, is refuted by the undisputed evidence before us that the alleged disparity figures set forth in Exhibit A are *current operating costs;* they are *not capital expenditures* and they do not reflect principal or interest expenditures for any school construction. It further is undisputed that no part of the proposed $32,000 expenditure in Darien, nor any of the principal or interest expenditures on its proposed new high school project, will be reflected in the dollars per pupil expenditures set forth in Exhibit A, upon which plaintiffs and intervenor rely.

(2) Assuming, however, contrary to the record presently before us, that corresponding capital expenditure figures could be presented to show corresponding disparities between school districts, as shown on Exhibit A with respect to current operating expenditures, neither intervenor nor plaintiffs have cited to us a single case, and we have found none, where the drastic relief here sought has been granted, viz. a forthwith halt in badly needed public school construction pending the determination of the constitutionality of a prevailing school financing system and pending a reasonable opportunity for the legislature to establish

a constitutional system in the event the current one is stricken down. As noted above, in the only two school financing cases where final judgments have been entered, periods of two or three years have been granted, *after final judgment*, to enable the legislatures to establish constitutional systems. And in the meanwhile, financing through the issuance of school bonds and other securities under existing laws has been specifically authorized. Rodriguez v. San Antonio Independent School District, *supra*, 337 F.Supp. at 286; Robinson v. Cahill, *supra*, 287 A.2d at 217.[3]

(3) Under the established equitable principle of "balancing of interests, so that a plaintiff, before his right has been established at trial, cannot cause loss to opposing interests far exceeding any that he may suffer", Valenti v. Dempsey, 211 F.Supp. 911, 912 (D. Conn.1962) (Clark, C. J., writing for a three judge district court); Hamilton Watch Co. v. Benrus Watch Co., 206 F. 2d 738, 743 (2 Cir. 1953), we hold that there is overwhelming evidence that the granting of a preliminary injunction here would cause undoubted irreparable loss to school children in depriving them of badly needed school buildings, compared to the absence of any evidence whatever before us of irreparable injury to intervenor or plaintiffs within the allowable time limits referred to in paragraph (2) above.

(4) While our adjudication here is limited to the narrow issue before us on the instant preliminary injunction motion as stated above, we cannot blind ourselves to the precedent (the first of its kind) which would be established by our granting of the preliminary injunction here sought. It in effect would put this Court in the business of passing on the appropriateness of various public school building projects throughout the

State pending the outcome of this litigation and possibly for a period of two or three years thereafter. Approximately 200 public school construction projects are now pending in Connecticut, the annual expenditure for which is at least $100 million. The annual expenditure for public school construction nationwide is in the order of $24 billion. We decline the invitation to arrogate any such responsibility to ourselves as a Court, nor to other courts throughout the Country by virtue of such a precedent.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the subject matter and the parties.

(2) Assuming, solely for the purpose of the instant motion, the likelihood that plaintiffs will prevail at the trial of the main action, intervenor has not sustained his burden of showing that denial of a preliminary injunction will cause him irreparable injury.

(3) Upon balancing the interests involved, the granting of a preliminary injunction will cause far more irreparable injury to school children than will be caused to intervenor by its denial.

(4) Intervenor is not entitled to a preliminary injunction.

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Finally, in expressing our hope that the extremely difficult and sensitive governmental problem raised in the main action as we have analyzed it above will receive from the Executive and Legislative branches of the State government the statesmanlike attention it deserves *before* the necessity of federal court adjudication of the grave constitutional issues involved, we echo the views expressed a decade ago by the late Chief Judge Charles E. Clark in

---

3. Indeed, the second amended complaint in the instant case requests that this Court afford "defendants and the Legislature of the State of Connecticut a reasonable time in which to take all

steps reasonably feasible to make the school system comply with applicable law, and, specifically, to restructure the financing system . . . ."

Valenti v. Dempsey, 211 F.Supp. 911, 913 (D.Conn.1962) (three judge court):

"And we trust the court can also count on the co-operation and assistance of the Chief Executive and the General Assembly in reaching for the correct solution. Indeed we are happy that, under the settled principles of law we are following, we need not view the state organs of government as adversaries to be given harsh mandates, but can instead look for their co-operative effort toward solving probably the most difficult governmental problem of our age."