Alvin **PARKER** et al., Plaintiffs,

v.

Marvin **MANDEL**, Governor of Maryland, et al., Defendants.

Civ. No. 71–1089.

United States District Court, D. Maryland.

June 14, 1972.

Stuart H. Rome, and William J. Giacofci, Baltimore, Md., for individual plaintiffs and intervening plaintiffs.

George L. Russell, Jr., City Sol., Ambrose T. Hartman, Deputy City Sol., Carol S. Sugar and Howard E. Wallin, Asst. City Sols., for plaintiffs Mayor and City Council of Baltimore City and Director of Finance of Baltimore City.

Francis B. Burch, Atty. Gen., Henry R. Lord, Deputy Atty. Gen., Richard G. McCauley and E. Stephen Derby, Asst. Attys. Gen., for defendant Marvin Mandel, Governor, and for other Maryland State officials named as defendants.

George W. Liebmann, Shale D. Stiller, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., and Richard S. McKernon, Acting County Atty., Rockville, Md., for defendant Montgomery County.

HARVEY, District Judge:

Presently before the Court is another of the many suits brought in state and federal courts since Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), in which state systems for financing public school education have been challenged as unconstitutional.[1] Plaintiffs and intervening plaintiffs in the action before this Court are school children attending public schools in Baltimore City and in eight Maryland counties and their parents, most of whom have paid local property or income taxes. Both State and City officials were named as defendants in the original complaint, but in the amended complaint the City officials have been realigned as parties plaintiff. Plaintiffs seek a declaratory judgment decreeing that the Maryland statutory system of financing public school education is unconstitutional as violative of the equal protection clause of the Fourteenth Amendment. Federal jurisdiction is claimed under 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

The original complaint requested the convening of a three-judge court under 28 U.S.C. §§ 2281 and 2284. However, after defendants initially moved to dismiss on various grounds, an amended complaint was filed eliminating such request, and the parties have agreed that

1. Opinions filed since Serrano include Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.Minn.1971); Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D.Tex.1971); Hollins v. Shofstall, No. C–253652 (Ariz.Super. Ct., Maricopa County, January 13, 1972); Robinson v. Cahill, 118 N.J.Super. 223, 287 A.2d 187 (1972); Spano v. Board of Education, 68 Misc.2d 804, 328 N.Y.S.2d 229 (Supreme Court, Westchester County, 1972); Milliken v. Green, No. 13664–C (Michigan Circuit Court, Ingham County, May 8, 1972).

this case should be heard by a single judge.[2]

Defendants named in the amended complaint are the Governor of Maryland and other State officials charged with the responsibility of administering State laws relating to the financing and operation of a public school system in Maryland. Although not originally a defendant, Montgomery County was granted leave to intervene as such and has accordingly been named as a defendant in the amended complaint.[3] Defendants have now filed a motion to dismiss the amended complaint on various jurisdictional and other grounds. The many questions presented by such motion have been fully briefed and ably argued by both sides.[4]

In essence, plaintiffs in the amended complaint assert two separate causes of action. In their first cause of action, they allege that defendants are charged with specific duties in connection with public education in the State of Maryland by Art. VIII, § 1 of the Maryland Constitution, which requires that the General Assembly "establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance." Plaintiffs allege that the State undertakes to discharge this responsibility financially by supplying various types of state aid to local subdivisions while requiring local governments to provide the substantial balance of the current costs of education mainly through local real property and income taxes.[5] It is asserted that this system of financing public education makes the expenditure for each child's education a function of the wealth of such child's parents and his neighbors as measured by the taxable wealth per pupil of the subdivision in which the child happens to reside. Plaintiffs further allege that there is a wide disparity in the abilities of the local governments to finance public education and in the per pupil amounts spent for current educational costs, inasmuch as the amount of the taxable wealth per pupil varies widely among the 24 subdivisions of the State. This reliance on local taxes, as well as specific inequities allegedly present in the state aid formulae, are claimed to favor the wealthier subdivisions. Because of the alleged direct relationship between expenditures for public education and both the quality of the education and the educational opportunity afforded, the school children-plaintiffs assert that they are receiving education inferior to that afforded children in wealthier subdivisions. These plaintiffs claim that there is neither a rational basis for nor a compelling state interest served by such discrimination, in violation of the equal protection clause of the Fourteenth Amendment.

The second cause of action is asserted by the parents of the school children-plaintiffs. The parent-plaintiffs allege

2. In both the original and the amended complaint, the plaintiffs designated their suit a class action. Defendants' motion to dismiss the suit as a class action, treated as a motion to strike the class action allegations, has previously been granted, the Court having concluded in view of the many interventions permitted that, if plaintiffs are successful, complete relief can be accorded by way of a declaratory decree entered against the defendants.

3. It was alleged in the original complaint that Montgomery County ranked first in the State on a per pupil basis as to the amount appropriated for current public school expenses. Such County claims therefore that it will be adversely affected by a decree to a greater extent than any other county in the State.

4. Both sides have submitted voluminous briefs citing numerous cases and other authorities, and the plaintiffs have furnished the Court with two books dealing with the general subject involved herein, namely, Wise, Rich Schools, Poor Schools (1968), and Coons, Clune and Sugarman, Private Wealth and Public Education (1970).

5. In Maryland, each county and the City of Baltimore, constitutes a separate school district.

that they pay real property or income taxes to their local subdivisions, and they complain that Maryland's system for financing public education requires them to pay, in order to receive the same or lesser educational opportunities for their children, higher taxes than do other taxpayers in wealthier subdivisions similarly situated. They likewise assert that the State laws establishing this system violate the equal protection clause of the Fourteenth Amendment.

As relief, the plaintiffs ask the Court to enter a decree declaring void Maryland's statutory system of financing public education. They would have the Court retain jurisdiction after the entry of such a declaratory judgment to allow the defendants and the Maryland General Assembly a reasonable time to restructure the system so that the quality of public education and educational opportunity measured by per pupil expenditures would no longer be a function of the taxable wealth of a school district, or of the parents located there, or of any entity other than the State of Maryland as a whole. If the system were not so restructured in a reasonable time, plaintiffs would have the Court take steps to provide "such further relief as may be just and equitable."

Defendants advance eight separate grounds in support of their motion to dismiss. They argue (1) that the grant of the relief sought is barred by the Eleventh Amendment; (2) that 28 U.S.C. § 1341, the Tax Injunction Act of 1937, prohibits this Court from granting the relief requested by plaintiffs; (3) that the amended complaint does not state a cause of action under 42 U.S.C. § 1983 because of the failure of the plaintiffs to allege the jurisdictional amount in controversy; (4) that the questions presented are political and otherwise non-justiciable; (5) that this Court does not have equity jurisdiction to grant the relief prayed; (6) that this Court should abstain from resolving this controversy until the state courts have construed the statutes attacked here; (7) that the amended complaint here

does not state a cause of action under 42 U.S.C.A. § 1983; and (8) that the amended complaint should be dismissed for failure generally to state a claim on which relief can be granted. Having heard argument and having reviewed the briefs, this Court concludes that the motion to dismiss should be denied.

### Jurisdictional Questions

Defendants claim first that the grant of relief sought here is barred by the Eleventh Amendment to the United States Constitution, which provides as follows:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

■■ This jurisdictional prohibition quite clearly extends to a suit by a citizen against his own state. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). However, plaintiffs base their action on the oft-cited exception established by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which held that a state official seeking to carry out an unconstitutional state law is deemed stripped of his representative character and may be sued as an individual acting illegally.

Defendants urge the Court to look beyond the named defendants and the formal relief requested and to recognize that the suit is in fact against the State of Maryland itself, inasmuch as it will require not only cessation of the allegedly illegal individual conduct but, ultimately, affirmative action by the State itself. In particular, defendants argue that the plaintiffs desire, and that a plaintiffs' victory would necessarily lead to, increased appropriations by the Maryland General Assembly so as to bring spending for public education in all subdivisions in the State up to the level of the wealthiest. The plaintiffs respond by pointing out that they desire

only "fiscal neutrality" by the State in the distribution of funds for local public schools and that they are seeking no particular level of spending but rather a reallocation of available funds on some basis other than the present one which they allege is partially tied to local wealth.

This Court would be blinking at obvious facts were it to assume that a plaintiffs' victory in this suit would not in time result in some affirmative State action. Indeed, plaintiffs request the Court to retain jurisdiction after entry of a decree to permit the State Legislature to restructure Maryland's system for financing public school education. However, most federal court decisions holding unconstitutional the actions of state officials necessarily lead in time to some affirmative state action to correct the unconstitutional statute or procedure which underlay the official conduct. See Reynolds v. Sims, 377 U.S. 533, 585–586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Plaintiffs would leave to the Legislature the precise manner whereby such restructuring would be accomplished. Presumably, plaintiffs hope and expect that the Maryland General Assembly would achieve complete equalization by increasing the amounts allocated to the poorer subdivisions. However, such affirmative action is neither expressly sought nor required by the allegations here. Under plaintiffs' theory of the case, were the Legislature to equalize by reducing expenditures for education in the wealthier counties or by some other means, such action would meet the constitutional infirmities claimed to exist.

■ The Supreme Court has indicated by the doctrine of *Ex parte Young* itself that the Eleventh Amendment is to be interpreted narrowly. See also Georgia R. & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952). This is not to say that the Eleventh Amendment no longer serves any purpose at all. It will undoubtedly bar relief in the federal courts where plaintiffs specifically seek an injunction requiring a state legislature to appropriate additional moneys. Williams v. Dandridge, 297 F.Supp. 450, 452, 459 (D. Md.1968), reversed on other grounds in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). But where the named defendants are individuals and the requested relief is simply a declaration that their official conduct is unconstitutional, the possibility of some type of affirmative state action in the future to correct the illegality will not bring the suit into conflict with the Eleventh Amendment. See Burruss v. Wilkerson, 301 F.Supp. 1237, 1239 (W. D.Va.1968). Accordingly, there is no merit to defendants' first point.

■ As a second ground for dismissal, defendants contend that the Tax Injunction Act of 1937, 28 U.S.C. § 1341, bars the grant of relief sought by plaintiffs here. That Act provides:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

A careful reading of the amended complaint indicates that it does not seek to enjoin the assessment, levy or collection of any tax, nor does it seek a mandatory injunction requiring that a particular tax be assessed. Furthermore, such a result would not necessarily follow were judgment entered for the plaintiffs. They formally seek only a severance of the alleged link between the financing of public school education and the wealth of local subdivisions, as well as certain changes in the state formulae for disbursing state aid for education to the subdivisions. If a declaratory decree were entered in favor of plaintiffs, the relief sought theoretically could be effected by pooling all revenues as currently collected and reallocating the resulting fund in some manner neutral as to local wealth.

Not even the second cause of action on its face seeks to enjoin a tax, even though the plaintiffs there sue as tax-

payers as well as parents. In this portion of the amended complaint, the parents do no more than join in seeking the same relief as the children. This Court concludes that the relief sought in each cause of action is not barred by the Tax Injunction Act.

■ Thirdly, defendants claim that their motion should be granted because of plaintiffs' failure to allege the jurisdictional amount in controversy as required by 28 U.S.C. § 1331 in cases in which jurisdiction is based on the existence of a federal question. Plaintiffs claim that jurisdiction exists independently of § 1331 under 28 U.S.C. § 1343(3), which provides:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\*    \*    \*    \*    \*    \*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

\*    \*    \*    \*    \*    \*

Whatever doubt may have existed heretofore as to defendants' contention has now been resolved. Since the arguments were heard in this case, the Supreme Court has ruled that the jurisdictional amount requirement of § 1331 does not limit the grant of jurisdiction under § 1343(3) and that the latter section provides jurisdiction in cases involving property as well as personal rights. Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). As in that case, jurisdiction here is not defeated because of the absence of an allegation of the jurisdictional amount in controversy.

■ As a fourth ground in support of their motion, defendants contend that the amended complaint presents a political question or is otherwise nonjusticia-

ble. Without treating all of defendants' arguments here, it is sufficient to note that the political question doctrine is intended primarily to prevent conflicts as to certain politically delicate questions between co-ordinate branches of the federal government. See Baker v. Carr, 369 U.S. 186, 210, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Applying the test articulated in that case, this Court can perceive no such conflict here under the Guarantee Clause of the United States Constitution, Article IV, § 4, or otherwise. McInnis v. Shapiro, 293 F.Supp. 327, 329–330 (N.D.Ill.1968); aff'd *sub nom.* McInnis v. Ogilvie, 394 U.S. 322, 89 S.Ct. 1197, 22 L.Ed.2d 308 (1969).

Defendants argue that the action is nonjusticiable because judicially manageable standards for resolving the controversy at issue are lacking. The three-judge court in *McInnis*, although accepting such an argument in a case involving allegations different from those present here, seemed to base its decision primarily on the substantive ground more fully discussed in the opinion. The amended complaint here, on its face, discloses no insuperable problems insofar as the framing of relief is concerned. At this stage of the proceedings, this Court has not even determined on the facts whether plaintiffs are entitled to the relief sought, much less the form of such relief. Were a decree to be entered and were the State Legislature subsequently to act or fail to act, conceivably difficult questions relating to the judicial manageability of future aspects of this litigation might be presented. At this point, however, before a hearing on the merits, it cannot be said that adequate standards are so lacking that the action should be dismissed. This Court finds no merit in defendants' fourth jurisdictional argument.

Finally, defendants contend generally that this Court does not have equity jurisdiction to grant the relief prayed. Analysis of this argument indicates that it is no more than a restatement of defendants' fourth point. For the reasons

stated hereinabove, defendants' fifth contention is likewise rejected.

## Abstention

■ Besides arguing that this Court is without jurisdiction in this case, defendants alternatively urge the Court to abstain from resolving this controversy until the state courts of Maryland have construed the Maryland statutes involved here or have determined whether those statutes contravene the Maryland Constitution. Defendants claim that a needless federal-state conflict would be avoided by such deference to state procedures. It is quite apparent that such a conflict exists in every federal court suit attacking the constitutionality of action taken by state officials. The abstention doctrine is hardly to be applied in every such case. See Lindsey v. Normet, 405 U.S. 56, 62, n. 5, 92 S.Ct. 862, 31 L.Ed. 2d 36 (1972).

In this instance, there is not presently pending any state suit in which the questions presently before the Court have been raised. Even if such an action were to be filed, it does not seem that a state court construction of the statutes under attack would help this Court to avoid federal constitutional issues and the ensuing conflict. Though complex in some ways, the statutes' meanings are not uncertain insofar as they affect the issues now before this Court. The only state court action which would change the posture of this case would be a declaration that the financing system for public schools violates the State Constitution which requires in Article VIII "a thorough and efficient System of Free Public Schools." Not only would such a claim appear doubtful of success, if made, but more importantly it would probably not achieve the remedy sought by plaintiffs here, under the equal protection clause, and would therefore be inadequate. Under such circumstances, this Court does not find that plaintiffs' resort to the state courts reasonably might be expected to allow it to avoid the federal constitutional issues raised here. See Reetz v.

Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). The allegations here do not indicate that this suit involves the narrowly limited "special circumstances" which require abstention. Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). On the contrary, the issues presented are important ones which should be finally decided one way or the other as soon as practicable. This Court will therefore not abstain.

## Failure to State a Claim

Pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, defendants advance two separate arguments in support of their contention that the amended complaint fails to state a claim upon which relief can be granted. First, they argue that no claim has properly been stated under 42 U.S.C. § 1983 because that statute requires an "intentional or purposeful discrimination against a discreet class." Secondly, they argue that in any event the complaint does not state facts amounting to a violation by defendants of the equal protection clause.

In asserting their § 1983 point, defendants rely on Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). A careful reading of that decision indicates that it dealt not with any special requirements of § 1983 but rather with the requirements of the Fourteenth Amendment itself. 321 U.S. at 7, 13, 64 S.Ct. 397. The Supreme Court there held that the failure of state officials to follow in a single instance presumably constitutional state statutes, in the absence of allegations or proof of purposeful discrimination against persons or classes of persons, would not amount to a violation of Fourteenth Amendment. That case did not deal as does this one with state statutes which are alleged to be unconstitutional. This case further differs from Snowden v. Hughes because the amended complaint

here does allege continuous discrimination against discreet groups of persons.

■ Defendants' further argument in support of their § 1983 point is to the effect that any alleged discrimination here results from private rather than state action and exists only because private wealth has distributed itself unequally among the subdivisions. Such an argument is disingenuous. Maryland is required by its Constitution to provide free public schools. It has chosen to finance its public school system largely through local taxes on county resources. Those resources obviously will vary, and not in ways directly proportional to the numbers of pupils in the subdivisions. Because of these differences in the local per pupil tax base, variations in fact must necessarily result, either in the funds locally available for schools or in the taxing efforts made locally. Indeed, the State, by providing equalizing aid, has long recognized that these disparities exist. Whether or not they violate the Fourteenth Amendment, such variations quite clearly result from State and not merely private action. Plaintiffs' allegations in this respect are therefore sufficient.

Defendants final and the most extensively developed argument in support of the pending motion is that the amended complaint does not allege a violation of the equal protection clause of the Fourteenth Amendment. They first contend that McInnis v. Shapiro, 293 F.Supp. 327 (N.D.Ill.1968), affirmed *sub nom.* McInnis v. Ogilvie, 394 U.S. 322, 89 S. Ct. 1197, 22 L.Ed.2d 308 (1969) and Burruss v. Wilkerson, 310 F.Supp. 572 (W.D.Va.1969), affirmed 397 U.S. 44, 90 S.Ct. 812, 25 L.Ed.2d 37 (1970), foreclose any possibility of relief here. The *Burruss* case was not decided on the initial pleadings. Only after an answer had been filed and certain stipulations of fact entered into by the parties, did the three-judge court dismiss the

action.[6] In *McInnis,* the three-judge court did rule upon and grant defendant's motion to dismiss. In both cases, the Supreme Court affirmed without opinion. In the absence of full discussion of the issues, this Court cannot be certain that the Supreme Court adopted the reasoning of both of those cases when it affirmed *per curiam.* In any event, the allegations in those cases, although similar to the allegations of the amended complaint here, were not the same as those presently before the Court and related to the statutory systems in West Virginia and Illinois which from the opinions would appear to be substantially different from the Maryland regulatory scheme. In those cases, the emphasis in the complaints was that the statutory scheme did not meet the students' educational "needs." Here, plaintiffs rely upon a somewhat different theory, namely, the claim that to meet constitutional standards school financing must be based on a principle of fiscal neutrality on the part of the state. *Burruss* and *McInnis* did not decide the latter question and therefore do not require dismissal of the amended complaint at this stage of these proceedings.

Before deciding whether a proper claim has been alleged here under the Fourteenth Amendment, this Court first must decide what constitutional test should be applied. In none of the cases similar to this one that have been cited by the parties has this question been considered in the light of recent and relevant opinions of the Supreme Court dealing with alleged violations of the equal protection clause. In view of the importance of this threshold question, a somewhat extended discussion is required.

Plaintiffs urge that education is a "fundamental interest" and that the classifications based on wealth alleged here, when related to the providing of equal educational opportunities, are

---

6. A single judge initially denied a motion to dismiss, concluding that a three-judge court should be convened to consider that action. Burruss v. Wilkerson, 301 F. Supp. 1237 (W.D.Va.1968).

"suspect" and thus require rigid or "strict scrutiny" if they are to be sustained.[7] See Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1076–1132 (1969). If such a test is applied, the State has the burden of showing that the discrimination in question is necessary to promote a compelling state interest. See *e. g.*, Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S. Ct. 1897, 23 L.Ed.2d 647 (1969); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969).

Defendants on the other hand argue that the traditional "reasonable basis" test should be applied by this Court in determining whether the equal protection clause has been infringed.[8] Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Rinaldi v. Yeager, 384 U.S. 305, 308–309, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966). If such a test is applied, it is presumed that the legislation under attack is valid and the burden of proving otherwise must be assumed by the challenging party. See McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Loving v. Virginia, 388 U. S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

Few if any guidelines have been suggested by the Supreme Court for determining whether a claimed violation of the equal protection clause should be considered under the strict scrutiny test or under the reasonable basis test. A high degree of subjectivity would appear to be involved in determining whether a subject is to be termed a fundamental interest or whether the classification is to be called suspect. See Cox, The Supreme Court, 1965 Term; Foreward: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv.L. Rev. 91, 95 (1966). Analysis of the

many cases applying the two tests indicates that the different results can be understood only on an *ad hoc* basis in terms of the subject matter involved.

Clearly, the stricter test is applied where the right to vote has been at issue. Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Carrington v. Rash, 380 U.S. 89, 96, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). Similarly, where a case has involved the right of a defendant in a criminal case to receive a fair trial, such right has been treated as a fundamental interest subject to strict scrutiny. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L. Ed.2d 811 (1963). More recently, the right to travel, recognized as a basic right under the Constitution, has been included in this list. Shapiro v. Thompson, 394 U.S. 618, 631, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Classifications because of race have been treated as suspect at least since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Unique historical considerations have been recognized as requiring the stricter test for racial classifications inasmuch as the equal protection clause was a product of the desire to eradicate legal distinctions founded on race. Shapiro v. Thompson, *supra*, 394 U.S. at 659, 89 S.Ct. 1322 (Harlan, J., dissenting); Dandridge v. Williams, *supra*, 397 U.S. at 489, 90 S. Ct. 1153 (Harlan, J., concurring). Classifications based on alienage are likewise suspect. Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

These and similar opinions suggest the following: (1) that those interests heretofore labeled fundamental are few and are rooted in some provision of the

---

7. This has also been referred to as the "compelling interest" test or doctrine. Shapiro v. Thompson, 394 U.S. 618, 658, 661, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Serrano v. Priest, *supra*, 487 P.2d at 1249; Van Dusartz v. Hatfield, *supra*, 334 F.Supp. at 875.

8. This has also been referred to as the "rational basis" test. Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Rodriguez v. San Antonio Independent School District, *supra*, 337 F.Supp. at 282.

Constitution, and (2) that no decision of the Supreme Court has held that education is a fundamental interest of the type requiring the application of the more rigid test to legislative classifications dealing with the subject. In Brown v. Board of Education, *supra,* the Supreme Court did state that education is "perhaps" the most important function of state and local governments. (347 U.S. 483, 74 S.Ct. 686). However, this statement was made in connection with the Court's assessment of the effects of racial segregation on children during their formative years in school. The strict scrutiny test was applied in *Brown* not because education is a fundamental interest but because classification by race is clearly suspect. What this Court must determine in this case is whether the relatively recent stricter test should now be applied to the Maryland statutory scheme under attack here, thus requiring the State to bear the burden of proving that the classification alleged is required by a compelling state interest.

That education is important and a vital concern of state and local government cannot be denied. But this is far from saying that education is so vital as to be called a "fundamental" interest from a constitutional point of view and thus made subject to a much more rigorous constitutional test than that applied in other areas of state concern. Can it reasonably be said that education is a more fundamental interest than health or welfare? Millions of young people in the United States are, of course, immediately and vitally affected by educational policies and expenditures. Millions of the aged on the other hand are more immediately and vitally affected by state expenditures for health care. Public welfare, which provides "the most basic economic needs of impoverished human beings" (Dandridge v. Williams, *supra,* 397 U.S. at 485, 90 S.Ct. at 1162), undoubtedly would be viewed by large numbers of underprivileged and disabled citizens as a matter of more fundamental and immediate concern than either health or education. This Court concludes that when state statutory programs dealing with education, health or welfare are to be examined under the equal protection clause, there is no essential difference in any of these three vital areas of state concern.

█ This Court holds that the test to be applied in this case is the reasonable basis test enunciated in Dandridge v. Williams, *supra.* That case originated before a three-judge court in this District. The plaintiffs had attacked certain regulatory provisions of Maryland's public welfare program. In holding that the Maryland regulation violated the equal protection clause, this Court found it invalid on its face for overreaching. Williams v. Dandridge, 297 F.Supp. 450, 468 (D.Md.1969). In reversing, the Supreme Court in an opinion by Mr. Justice Stewart rejected the application of the concept of overreaching in a case dealing with state regulation in the social and economic field. Citing Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), the Court said that the application of such a standard would be far too reminiscent of an era when the Court thought that the Fourteenth Amendment gave it power to strike down state laws "because they may be unwise, improvident, or out of harmony with a particular school of thought." The proper test to be applied was described as follows (397 U.S. at 485, 90 S.Ct. at 1161):

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. "The problems of government are practical ones and may justify, if they do not

require, rough accommodations—illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.[9]

Two decisions of the Supreme Court since *Dandridge* support this Court's conclusion that the strict scrutiny test is not to be applied here.[10] James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971) involved an attack on a provision in the California Constitution requiring that no low-income housing project could be built without the approval of a majority of those voting at a community election. Publicly assisted housing programs designed to benefit other income groups were not subject to such prior approval. Emphasizing that no racial discrimination was involved, the Supreme Court upheld the referendum provision in question, apparently under the reasonable basis test. In Gordon v. Lance, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), the West Virginia plaintiffs had claimed that their schools had remained basically unimproved since 1946 and fell far below the state average because of a requirement in the State Constitution that political subdivisions might not incur indebtedness or increase tax rates beyond a certain limit without a 60% affirmative vote. Noting that the importance of matters of finance and taxation is more properly left to determination by

the states and the people than to the courts, the Supreme Court rejected the Fourteenth Amendment attack on the statutes and constitutional provision there involved. The Court said the following (403 U.S. at 6–7, 91 S.Ct. at 1892):

> That the bond issue may have the desirable objective of providing better education for future generations goes to the wisdom of an indebtedness limitation: it does not alter the basic fact that the balancing of interests is one for the State to resolve.

In Shapiro v. Thompson, *supra,* the Court, although applying the strict scrutiny test in a case involving the right to travel, observed that a State "may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program." 394 U.S. at 633, 89 S.Ct. at 1330. That the Supreme Court chose to equate education and welfare in discussing state limitations on such programs is a further indication that the Court would apply the *Dandridge* test to an attack on a state system for financing education.

The United States Court of Appeals for the Second Circuit has relied on *Dandridge* in applying the reasonable basis test in a case in which New York's statutory scheme for supplying school books was claimed to violate the equal protection clause. Johnson v. New York State Education Department, 449 F.2d 871 (2d Cir. 1971). In upholding the legislation, the Court found decisions of the Supreme Court applying the strict scrutiny test inapplicable because "although education is no doubt an area of

9. Within the past few weeks, this test has been reaffirmed in another welfare case. In Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), the Supreme Court, after citing *Dandridge* with approval, said:

> "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket. The very complexity of the problems suggests that there will be more than one constitu-

tionally permissible method of solving them."

10. The Supreme Court's affirmances of both *McInnis* and *Burruss* preceded the *Dandridge* decision. In both of those cases, the lower courts applied the reasonable basis test. Whatever other conclusion might be reached as to the effect of the *per curiam* affirmances, it would seem reasonably clear that the Supreme Court could not have decided that the strict scrutiny test should have been applied in those two cases.

fundamental importance, the Supreme Court has made clear its view that in the area of social welfare, the 'compelling state interest' theory does not apply even though basic needs may be involved." (449 F.2d at 879).

Consideration of the reasoning of the recent public school equalization opinions relied upon by plaintiffs does not require a contrary result. The *Serrano* case, although decided after Dandridge v. Williams, did not mention that decision or the test discussed by the Supreme Court therein. Indeed, in *Serrano,* the Court conceded that the argument that education is a fundamental interest which may not be conditioned on wealth is not supported by any direct authority. Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D.Tex.1971), likewise did not cite or discuss *Dandridge,* but reached the conclusion that the rational basis test was normally applied "in reviewing state commercial or economic regulation." (at 282). There is language in Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.Minn.1971), indicating that the District Court disagreed with the result reached by the Supreme Court in *Dandridge.* (at 875).

To hold that the strict scrutiny test applies to legislation of this sort would be to render automatically suspect every statutory classification made by state legislatures in dealing with matters which today occupy a substantial portion of their time and attention. If the test which plaintiffs seek to apply is the appropriate standard here, then a state, on each occasion that a similar Fourteenth Amendment attack were made against a statute dealing with health, education or welfare, would be required to bear the burden of proving the existence of a compelling state interest. This Court cannot conclude that state legislatures are to be straitjacketed by such recently evolved constitutional theory in areas that have traditionally been the exclusive concern of the state.

In the language of *Dandridge,* the Fourteenth Amendment "gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." 397 U. S. at 486, 90 S.Ct. at 1162. By terming a particular interest fundamental and then applying the strict scrutiny test, a federal court is presented with a ready means for avoiding *Dandridge* and imposing its own policy views upon a state legislature. The complex considerations which enter into devising and financing health, education and welfare programs have traditionally been left to legislative bodies, both state and federal. State legislation of this sort is of course subject to review in federal court under the Fourteenth Amendment, but the proper standard for such review has always been and should continue to be the reasonable basis test.

Plaintiffs argue that even if education is not considered a fundamental interest, the strict scrutiny test should still be applied in this case because wealth is a suspect classification. However, the cases relied upon by plaintiffs in support of this argument all have involved interests held to be fundamental. In Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the interest involved was the right to vote.[11] In Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), the interest was the right of a criminal defendant to a fair trial.

In James v. Valtierra, *supra,* a classification based on wealth as related to public housing was involved. Distinguishing Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), as a case resting on distinctions based on race, the Supreme Court's majority opinion rejected the position tak-

---

11. Writing for the majority in that case, Mr. Justice Douglas termed the right to vote "too precious, too fundamental" to be burdened by Virginia's poll tax. 383 U.S. at 670, 86 S.Ct. 1079.

en by the three dissenting justices that the referendum requirement for low income housing was "a suspect classification which demands exacting judicial scrutiny, \* \* \*." 402 U.S. at 145, 91 S.Ct. at 1335. Likewise, in several recent decisions in this Court, the reasonable basis test has been applied even though a classification based on wealth was involved. In Kelly v. Schoonfield, 285 F.Supp. 732 (D.Md.1968), and in Morris v. Schoonfield, 301 F.Supp. 158 (D.Md.1969), this Court, relying on Rinaldi v. Yeager, *supra*, held that the reasonable basis test was to be applied when a state statute was attacked under the equal protection clause because it provided for discriminatory treatment of indigent defendants in criminal cases.[12] This Court does not conclude that the allegation that an invidious legislative classification has been made on the basis of wealth requires consideration of such legislation under the strict scrutiny test. If such a claim can be proved, relief is available in a suit brought under the equal protection clause in which the reasonable basis test is the standard of review.

Defendants argue that if the Maryland statutory scheme for the financing of public school education is considered under the reasonable basis test, there can be no constitutional violation.[13] This Court cannot agree. Certainly, classifications by the State of Maryland in its public school laws which bear no reasonable relationship to any valid state objective would be violative of the equal protection clause. In Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L. Ed.2d 36 (1972), the Supreme Court applied the reasonable basis test and found that certain portions of Oregon's procedures for the eviction of tenants arbitrarily discriminated against the poor and violated the equal protection clause.

The amended complaint here alleges that the statutes in question discriminate purposefully and unreasonably, and numerous facts are stated in support of the gross inequalities alleged.[14] Insofar as the pending motion is concerned, this Court must accept such allegations as true. Defendants do not and of course cannot deny that many of the alleged disparities exist. But, relying on various statistics and reports, defendants argue that such disparities have a reasonable basis, that they have been minimized by various enactments in recent years and that the history of the funding of public school education in Maryland shows no unconstitutional discrimination. A resolution of these questions cannot be made at this stage of these proceedings. At trial the statistics and reports relied upon by both sides in argument will be subject to proof.

■ Although no answer has as yet been filed, the arguments heard by the Court on this motion indicate that various factual questions are disputed. Among the many issues at trial will be whether, as alleged, there is a direct and substantial relationship between the relative amounts spent on public education in the respective Maryland subdivisions and the quality of education and educational opportunity afforded. Another

---

12. The *Morris* case was subsequently remanded by the Supreme Court for consideration of a recently enacted Maryland statute in light of Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). Morris v. Schoonfield, 399 U.S. 508, 90 S.Ct. 2232, 26 L.Ed.2d 773 (1970). Upon remand this Court held, again citing Rinaldi v. Yeager, that equal protection was being denied to certain prisoner-petitioners whose commitments included the imposition of costs and that other such petitioners were being denied their constitutional rights because state judges were not complying with the new Maryland statute. Arthur v. Schoonfield, 315 F.Supp. 548 (D.Md.1970).

13. In Rodriguez v. San Antonio Independent School District, *supra*, and in Robinson v. Cahill, *supra*, the Court indicated that it would have reached the same result on the facts considered even under the reasonable basis test.

14. The second cause of action, although superficially more complex, makes essentially the same constitutional claim as does the first.

question raised by the arguments is whether the Maryland statutory scheme considered in its entirety tempers disparities in the Maryland system to such an extent that there is no violation of the equal protection clause. Before this Court can determine whether there has been a constitutional violation here, these and other issues must be tried.

For the reasons stated, defendants' motion to dismiss is denied.