**MARTIN COUNTY v. ASKEW, Governor, et al.**

No. 72-1108.

**DISTRICT SCHOOL BOARD of LEE COUNTY, el al v. ASKEW, Governor, et al.**

No. 72-1030.

Circuit Court, Leon County.

November 22, 1972.

Stephen B. Calvert, County Attorney, and William R. Scott, Stuart, for plaintiff Martin County.

James E. Messer and Benjamin K. Phipps, both of Tallahassee, for plaintiff school boards.

William G. O'Neill, Ocala, for defendant Auditor-General.

Winifred L. Wentworth, Assistant Attorney General, for defendants Auditor-General and Department of Revenue.

BEN C. WILLIS, Circuit Judge.

*Final judgment:* This cause came on for final hearing on the pleadings, evidence, argument and briefs of counsel for the respective parties, and the court being otherwise advised, it is ordered and adjudged —

1. This is an action for declaratory judgment and other relief against the auditor-general, the state board of education and the department of education in which the plaintiffs and the intervenors seek an invalidation of the auditor-general's "assessment ratios" and their use in the disbursement of state funds under the state minimum foundation program (Chapter 236, Florida Statutes). Case no. 72-1030 was brought by the district school boards of Lee, Pinellas, Sarasota, Alachua and DeSoto counties, with the boards of Charlotte and Martin Counties intervening. This purports to be a class action in behalf of all other districts similarly adversely affected. This case is consolidated with case no. 72-1108 which is brought by Martin County against the auditor-general and the department of revenue in which an attack is made on the validity of the auditor-general's "assessment ratios" as it affects distribution of the proceeds of the seventh-cent gasoline tax imposed by F. S. §206.60(1) and distributed under §206.60(2). Under the mandate of §206.60(2)(b)(3) the calculation of distribution of funds is dependent upon the auditor-general's certification of the level of assessment as provided in §236.07(5). In both cases the central issue is the validity of the auditor-general's certifications of "the ratio of the assessment roll [of each school district] compared to full value", §236.07, subsections (5), (b), (1) and (9). The defendants in both cases assert the validity of the certifications and seek dismissal of the actions.

2. Though the evidence has been massive and the points of law argued have been numerous, there are two basic questions before the court, namely —

(a) Whether or not the legislation mandating the ascertainment by the auditor-general of the level of assessment of the non-exempt taxable property of the several counties as a basis for distribution

of minimum foundation state school funds to school districts and of gasoline tax funds to counties is constitutional; and

(b) If such legislation is constitutional, have the procedures used by the auditor-general been in accordance with constitutional and statutory provisions so as to sustain his certifications of the levels of assessment of the respective districts and counties?

3. The constitutional question and its various facets will be considered first —

(a) The plaintiff school boards assert that Art. IX, §1, Const. 1968, requires that the legislature, which possesses the taxing power and the authority to appropriate public funds of the state, make "adequate provision . . . by law for a uniform system of free public schools . . .". It is noted that the prior constitution (1885) in its Art. XII, §1 had commanded the legislature to provide for a uniform system of free public schools and for the liberal maintenance of such system. Thus, it is clearly set forth in the organic law of this state that there be established a uniform system of free public schools and that laws be made which would adequately support such a system and assure its establishment and maintenance. Uniformity of operation throughout the state is a mandatory criterion and this purpose envisions both an equality of educational opportunity to all pupils of the public schools regardless of locality, and also the objective, state-wide, "to advance and maintain proper standards of enlightened citizenship". See State v. Henderson, Fla. 1939, 188 So. 351. Also to be considered are the state and federal constitutional requirements of equal protection of the laws and the concomitant principle of non-discrimination between persons of the same rational class. With regard to this federal constitutional right as set forth in the 14th Amendment, citation has been made of several federal court decisions which have held that a state system of financing public schools which makes spending per pupil, based upon a school district's wealth, a violation of the equal protection clause. See Van Dusartz v. Hatfield (USDC-Minn. 1971), 334 F. Supp. 870. Also, in Rodriques v. San Antonio Independent School District, (3-judge USDC-Tenn. 1971) 337 F. Supp. 280, it was found that the state's minimum foundation program favored children from wealthy districts and discriminated against those from poor areas and was thus invalid. The court regarded public education as involving a "fundamental interest" of the affected pupils which could not be made dependent upon the wealth of the district. Also cited is the case of Serrano v. Priest, 5 Cal. 3rd 584, 487 P. 2nd 1241 (1971), wherein a state court invalidated a state system of financing public education because of discrimination. That court held that when a state has

undertaken to provide educational opportunities, such an opportunity "is a right which must be made available to all on equal terms".

(b) The above mentioned cases may well express constitutional concepts which may ultimately be pronounced and applied in Florida by the federal and state judiciary in cases in which those very points are justiciable issues. However, in this case it is not deemed necessary to make such a determination for the reason that the court finds that the very objects and normal results of the state minimum foundation program (F. S. Chapter 236) are to provide uniformity, non-discrimination and adequacy of support without regard to the wealth of a particular school district. On the contrary, it seeks to provide state funds on the basis of the needs of a particular district above its own capacity to provide for them. It serves to avoid inequality rather than to create it.

(c) In addition to finding that the program is not vulnerable to a charge of denying equal protection of the law, it is apparent that it is fully responsive to the commands of our state constitution for adequate support of a uniform system of free public schools. The mandate to the legislature is to provide "by law" for such a system. The legislature is not restricted to appropriations of state funds for this purpose but may enact laws providing for raising some of these funds by the locality where the school facilities are operated. Recognizing a long standing concept of peculiar local interest, concern, and understanding of local educational problems and needs, which vary from place to place, it has been deemed wise to repose in the several districts both the responsibility and power to fashion and apply certain practices and administration of the school systems within rather detailed uniform state standards. Its purpose is to create a minimum standard to assure creditable results, but recognizing that the officers selected by the people as their board members and school superintendent and as their tax assessor and collector may more effectively pursue the worthy goals than would be the case of complete centralized state control and responsibility. In this pattern there is recognized a duty at the county level to provide a part of the financing, the amount of which is dependent upon the local capability to levy and collect ad valorem taxes on the non-exempt real and personal property of the district. In this area there has not been a serious challenge to the constitutional validity of the program.

(d) However, it is contended that the determination of the taxable value of local property by the auditor-general by ascertainment of the level of assessment of each district violates a number of other constitutional provisions. Cited are Art. VII, §§4 and 9,

Const. 1968. §4 requires "general law regulations" to secure a just valuation of all property for ad valorem taxation, with a proviso that lands for agricultural and non-commercial recreational purposes may be classified and assessed solely on the basis of character or use and personal property for sale as stock in trade and livestock may be valued at a specified percentage of value. §9 grants authority to enact laws permitting counties, school districts and municipalities to levy ad valorem and other taxes, but places certain limitations on such levies, including a limit of ten mills for all school purposes. Also cited is Art. VII, §1 (d) which provides for certain county officers, including a tax assessor. The aggregate of these provisions, it is urged, cast upon the constitutional tax assessor the sole duty and authority to assess the properties in a county for ad valorem tax purposes, and, as a corollary, for any other purpose wherein the value of taxable property in his county is involved.

(e) It is also contended that the auditor-general is a legislative officer appointed by the legislature pursuant to Art. III, §2 and his intrusion into the assessment field violates the separation of powers section (Art. II, §3) which provides — ". . . no person belonging to one branch shall exercise any powers appertaining to either of the other branches *unless expressly provided herein*". (Emphasis supplied). It is not to be doubted that the auditor-general is a legislative officer, selected differently from any other officer, and is answerable to, appointed by and removable by the legislature exclusively. He is the "auditor" referred to in Art. III, §2 "who shall audit public records and perform related duties as prescribed by law or concurrent resolution". The performance of ratio studies and determining levels of assessment are related duties to the audit of public records and thus within the permissible orbit of constitutional authority to enact the statutes under attack here, and it comes within the exception to the separation of powers in Art. II, §3. With regard to the status of the tax assessor as the sole authority (subject to equalization and certification) to assess property for ad valorem purposes, the laws under attack do not purport to nor have the effect of changing any assessment for such purpose. The assessments are themselves not disturbed.

(f) The plaintiffs contend that the assessor and the local school officials find themselves helpless to meet the auditor-general's findings adverse to them because of the procedures prescribed, including Chap. 72-288 (effective Apr. 25, 1972) which creates F. S. §192.012(3) which says —

"(3) The ratio studies required under paragraph 236.07(9) (a) shall not be used to supercede the procedure called for in subsection 193.114(5) relating to certification of the tax rolls by the department of revenue."

The mentioned subsection 193.114(5) requires each assessment roll to be submitted to the department of revenue for review on or before the first Monday in July. The review is to determine if the rolls meet all the requirements of law. Part I of Chapter 194 provides for administrative review of the roll and adjustments may be made by a board of tax adjustment which includes two members of the school board. This board hears complaints, etc., in meetings to commence not later than the first Tuesday in September. The plaintiffs contend that there has been an absence of due process in the procedures followed. Since the ratio study relates to the 1971 roll, long ago certified by the department of revenue and beyond any "cure" by any agency, it is asserted that the only recourse would be an administrative hearing with opportunity to be heard on the merits of the study, and if no relief is forthcoming to voluntarily adjust the 1972 rolls by the assessors, over whom the school authorities have no control. The contentions of the plaintiffs of denial of due process are very impressive as a criticism for failure to have afforded better opportunities to tax assessors and to interested parties in a position to apply pressure on them to bring into line the assessment rolls to avoid loss of funds needed for the school program. However, the auditor-general's actions are not directed toward depriving anyone of any property right or personal liberty. It is to determine the measure of state appropriations and their distribution among the counties. The defendants contend the plaintiffs, not being "persons" but public bodies, have no standing to claim "due process". This question need not be answered. Suffice it to say that the court does not find that this is a case in which denial of "due process" is involved.

(g) Therefore, the court does not find that there is any unconstitutionality per se in any of the statutes involved.

4. The second, and most complex of the questions before the court, is whether the auditor-general, in carrying out his duties under §236.07(9) and in producing his certifications of the ratio of assessments to full value, has followed the requirements of the statutes involved and has been in accord with constitutional requirements.

(a) The statutes are examined first.

(1) Chapter 236 (Minimum Foundation Program) sets forth in much detail minimum standards for public school programs. See F. S. §236.02. One condition for participation in state appropriations by a district is to "[M]ake the minimum financial effort required for the support of the . . . program as prescribed by law." §236.02(8). In §236.07 a procedure is set forth for determining

the apportionment to be made to each district annually from state funds. §236.07(8) specifies the method of determining the total cost of the program, and §236.07(9) prescribes the portion that each district shall provide toward the cost. §236.07(10) provides that the allocation to each district of state funds is to be the total cost less the minimum effort required of the district under subsection (9).

(2) §236.07(9) requires the raising in each district of an amount equal to "six mills in 1972-73 . . . of tax on ninety per cent of the one hundred per cent non-exempt valuation of that district for the preceding calendar year". It further provides —

"The level of assessment of property for each district shall be determined by the agency authorized by law. After consultation with the department of revenue, the auditor-general is directed to determine for each school district the ratio of the assessment roll compared to full value and shall certify the results of such study to the department of education. In making this certification, the auditor-general shall consider and be guided by the statutory standards to which the assessors are required to adhere. This certification shall be made no later than May 1 of each year. The school district's share of the minimum foundation program cost shall be computed at a level of assessment equal to ninety per cent of the one hundred per cent non-exempt assessed property valuation of the district for the preceding calendar year."

(3) However, effective April 25, 1972 there was enacted Chap. 72-228 (also coded as F. S. §192.012) which provides that the ratio study and determination of level of assessment for the minimum foundation program for 1972 and 1973 shall be conducted on non-exempt real property only, and that the non-exempt tangible personal property, as determined by the tax assessor, added to the value of non-exempt real property, based on 100 per cent assessment as determined by the auditor-general would be the basis for determining each school district's share of the program costs for those years. As previously noted, this act prohibits use of these ratio studies to supersede the procedure called for in F. S. §193.114(5) relating to certification of tax rolls by the department of revenue.

(4) Also, the legislature enacted Chap. 72-290 (also coded as F. S. §193.023(3) which provides —

"In revaluating property in accordance with constitutional and statutory requirements, the tax assessor may adjust the assessed value placed on any parcel or group of parcels based on mass data collected, on ratio studies prepared by

an agency authorized by law, or pursuant to regulations of the department of revenue."

(b) The procedures and methodology of the auditor-general are examined next.

(1) Though the statute provides that the certifications "shall be made no later than May 1 of each year", the initial certifications were not made until June 23, 1972 and certain amended certifications were not made and released until August 30, 1972.

(2) The auditor-general himself made no effort to directly participate in the ratio study. He employed Mr. James Pace in December 1970 as director of "Assessment Ratio Division" but gave no written instructions to him. However, there were some oral conversations about the type of study to be made. Work was begun on the 1971 rolls in August or September of 1971. Mr. Elmer Boland was employed as statistician who devised a method of random sampling. Applying certain statistical techniques to ascertain a proper size sample for each county, samples were selected at random of the parcels on the tax rolls and appraisers were employed to make actual appraisals of the samples. These appraisals were then aggregated in each county and the total compared with the tax assessor's valuation of the same samples. This comparison yielded a ratio of assessment to appraisal and the ratio obtained was deemed to be determinative of the level of an assessment.

(3) These ratios were then certified to the department of education. There the ratio was applied to the real estate assessments of the tax assessor to produce the 100% real estate value. To this were added the total of railroad, etc., real estate assessments and the total personal property assessments on the tax roll. The sum of these was then reduced to 90% and then multiplied by six mills to produce the amount required from the district for the minimum foundation program under §236.07 (8).

(4) The plaintiffs have attacked the methodology employed on several grounds —

(a) The sampling procedure involved too few samples.

(b) The random samples should have been stratified, i. e., separate samplings should have been made of the different types of property such as residential, commercial, agricultural, industrial, etc., because tax assessors use different approaches to different types of property.

(c) A moving average technique should have been employed to test the adequacy of the sample. This technique involves successive

testing of increments of ten samples until a fairly stable ratio is found to persist.

(d) The preliminary studies and tests to ascertain level of confidence and sample sizes were inadequate.

(e) The auditor-general failed to consider and be guided by the statutory standards to which assessors are required to adhere (§236.09(a)) which are set forth in §193.461(6) with regard to agricultural properties. The method of valuing pasture lands by a computation of beef production and market realization based on soil tests and applying certain "cost of cure" where applicable are said to be grossly unreliable. Also, the method of valuing forestry lands by the "sight index" method is criticized. This method consists of selecting a tree of some tallness located on a typical part of the parcel involved, measuring its height, ascertaining its age by boring through the trunk and counting the rings in the core, and then computing the productivity of the land in terms of board feet of saw timber and cords of pulp wood per acre per year, and translating this into a value of the land.

(5) It is well to observe that this court is not called upon to determine whether or not the auditor-general employed the best techniques to ascertain the full true value of the assessable real estate. The question is whether such techniques were productive of the results the statutes sought and if he followed the directives in the statutes. This is also not a case in which the attack is to invalidate or sustain the assessments made by the county assessors. The burden of proof is on the plaintiffs to establish by the greater weight of the evidence that the auditor-general's certifications do not meet the standards of the law.

(6) In the last analysis, the auditor-general has been directed by his appointor, the legislature, to make an appraisal of all the non-exempt real estate in the state and compare it to the appraisals made by the several county assessors and establish a ratio between them. Appraisal of real estate is not an exact science but at best, is an inexact estimate of value. Because of the "green-belt" law, the appraisal of agricultural and forestry lands is particularly difficult because the traditional test, fair market value, may not be utilized. Appraisals are made by the assessors of taxes and, in this case, by the auditor-general. The legislature has chosen, for its own reasons, to distrust the appraisals of the tax assessors and to rely upon the auditor-general to produce the appraisals of real estate to be controlling in the distribution of state monies to the districts and counties. It directed him to consult with the department of revenue, which was done, to be guided by the statutory standards to which tax assessors are required to adhere, and to make his certifications

no later than May 1. It is worthy of note that the auditor-general was given a massive task with little time to fulfill it. Individual appraisals of all parcels of property were not feasible. Selected was a sampling procedure based on actual appraisals of random selected properties and a comparison with the valuations by the assessor and obtaining a ratio to be applied to the entire body of taxable real estate. It is to be reiterated that the assessments of the assessor are appraisals involving judgment of the assessor as reviewed by the department of revenue and the board of tax adjustment. Any judge who has tried eminent domain proceedings has observed the wide disparity in the appraisals of the same property by different qualified appraisers. Indeed, in those cases the assessment by the tax assessor is usually not even admissible in evidence. The technique of sampling is an acceptable statistical procedure to determine a statistical fact. Its reliability is dependent upon the selection of an adequate number of samples to fairly be representative of the whole or "universe". In this case the random selection was employed without stratification. There is a great disparity of opinion among the experts who testified as to whether or not the random unstratified selection was reliable. There was also a wide disparity among the experts as to whether there were an adequate number of samples. Each expert gave his own reasons for the conclusions reached. After considering all of the testimony and evidence the court does not find that the greater weight of the evidence establishes that the sampling procedures employed were outside of the bounds of reasonably acceptable statistical techniques. The court is not required or permitted to determine what techniques would be more convincing to the trial judge, but only if they are in accord with acceptable professional standards. Also, this is not a case of overturning the judgments of the tax assessors and the presumptions of their correctness for tax assessing purposes. It is a case of whether or not the findings of the auditor-general, also clothed with a presumption of correctness, are to be invalidated.

(7) The appraisals actually made are, of course, significant in the process. The attack on them has been largely on the appraisals of range land and forestry properties. The techniques employed are debatable but are not shown to be without rationality. Again the the experts differ widely. The problem of appraisal in the light of the "green belt" law is inherently artificial. The court does not find that the methods used and applied are devoid of credibility, or that they have failed to be in accord with statutory criteria. The appraisers employed are found to be qualified. Again, it must be emphasized that the court is not called upon to choose between appraisals, but only to ascertain if the appraisals may support a finding of value, which the legislature has in effect done.

(8) Attacks were made on the results of the findings of level of assessments when the real estate ratio is applied while the personal property valuation of the assessors are accepted at full value. The mathematical results do show different alterations in different counties with some sustaining losses and others faring well. However, these variances do not militate against a legal result as the auditor-general's findings on the real estate are the legislative standards to be applied to that type of property and the tax assessor's findings on the personal property is the accepted determination of that class. The county's share is computed on the basis of six mills on the aggregate of 90% of the combined real and personal properties as ascertained by the agencies selected by the legislature.

(9) It is quite clearly shown that the application of the certifications will result in the plaintiff counties and other counties receiving less than would have been the case if the assessments by the tax assessor were accepted at face value and that the difference in monies could be well used and be productive of better local programs. Though hardship is evident, it is not shown to be critical. The results are not shown to be so inequitable and injurious as to warrant judicial intervention.

(10) The most troublesome question has been the construction to be given to the requirement that the certifications be submitted by May 1 and the failure of the auditor-general to meet this deadline. The statute employs the word "shall" which ordinarily has a mandatory connotation. Fla. Tallow Corp. v. Bryan, (4DCA-1970) 237 So.2d 308; Neal v. Bryant, Fla. 1962, 149 So.2d 529. However, in Reid v. Southern Development Co., 52 Fla. 595, 4 So. 206, it was held that when a particular provision of a statute relates to a matter of convenience rather than substance or where the directions are given with a view to the proper, orderly and prompt conduct of business merely, the employment of the term "shall" may be generally regarded as directory. The court is of the view that this exception to the general rule is applicable in this case. The tardiness of the certifications were to some extent productive of inconvenience and confusion to the plaintiff boards, but are not shown to have been so prejudicial as to warrant their invalidation. The delay is somewhat illustrative of the tremendous burden the legislature chose to impose on the auditor-general and some of the handicaps under which he was forced to operate. However, this is in the realm of legislative prerogative and not a ground for judicial action.

(11) The court has not overlooked or failed to consider the trial court judgment and the appellate court opinion in Dept. of Rev. v. Bell, (1DCA-1969) 227 So.2d 684. Also, the court is aware of its own rulings in Stuart v. Askew (Leon Circuit Court 71-58). In the

*Stuart* case the court was confronted with an entirely different type of ratio study, namely an assessment to sales study, while here there is an assessment to appraisal study. Vastly different factors were involved in the two cases. The *Bell* case was limited largely to alleged wide discrepancies between assessments in different counties and did not establish inflexible guidelines applicable to this case.

(12) In recapitulation, the court concludes that the plaintiffs have failed to establish by the greater weight of the evidence a right to judicial relief other than a declaration of rights as herein set forth.

(13) For the same reasons as hereinbefore set forth, it is concluded that the plaintiff, Martin County, in case no. 72-1108, is entitled to no relief other than a declaration of rights as hereinbefore stated.

(14) Accordingly, except for declarations rendered pursuant to F. S. Chap. 86 as herein set forth, the prayers for relief in both 72-1030 and 72-1108 are denied.

(15) Each party shall bear its own costs.